UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                              X
THE NEW YORK TIMES COMPANY,                   :
CHARLIE SAVAGE, and SCOTT SHANE,              :
                                              :
Plaintiffs,                                   :
                                              :
       - against -                            :    11 Civ. 9336 (CM)
                                              :
UNITED STATES DEPARTMENT OF                   :
JUSTICE,                                      :
                                              :
                        Defendant.            :
                                              X
```

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY
## JUDGMENT AND IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

David E. McCraw
Nabiha Syed
Legal Department
The New York Times Company
620 8th Avenue – 18th Floor
New York, NY 10018
phone: (212) 556-4031
fax: (212) 556-1009
mccraw@nytimes.com
Counsel for Plaintiffs

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTS AND PROCEDURAL BACKGROUND .......................................................................2

A.    Mr. Shane's FOIA Request ("Shane Request")..........................................................4

B.    Mr. Savage's FOIA Request ("Savage Request").....................................................5

ARGUMENT..............................................................................................................................6

I.      THE GOVERNMENT HAS IMPROPERLY INVOKED THE GLOMAR
DOCTRINE IN REFUSING TO ACKNOWLEDGE THE EXISTENCE
OF LEGAL ANALYSES OF THE GOVERNMENT'S USE OF
TARGETED KILLING ......................................................................................................6

II.    NEITHER EXEMPTION 1 NOR EXEMPTION 3 PROVIDE A BASIS
FOR WITHHOLDING LEGAL ANALYSIS UNDER FOIA ...............................11

III.   EXEMPTION 5 DOES NOT PROVIDE A BASIS FOR
WITHHOLDING THE THE LEGAL ANALYSIS SOUGHT BY NYT..............14

A. Adoption of the Legal Analysis Behind Targeted Killing Defeats the
Deliberative Process and Attorney-Client Privileges.......................................15

1.  Deliberative Process Privilege..................................................................15

2.  Attorney Client-Privilege ........................................................................19

B. Both Processes Privileges Have Also Been Waived .........................................22

CONCLUSION ........................................................................................................................25

# TABLE OF AUTHORITIES

## *CASES*

*ACLU v. Dep't of Def.* (*ACLU I"*), 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ...............................6, 13

*ACLU v. Office of the Dir. of Nat'l Intelligence ("ACLU II"),* No. 10 Civ. 4419 (RJS),
2011 WL 5563520 (S.D.N.Y Nov. 15, 2011) ................................................................................12

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,* 601 F.3d 143 (2d Cir.
2010) .............................................................................................................................................6

*Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U. S. DOJ*, 09 Civ. 8756 (VM),
2011 WL 4001146 (S.D.N.Y. Aug. 30, 2011)....................................................................18, 20, 21

*Bronx Defenders v. Dep't of Homeland Security*, 04 Civ. 8576 (HB), 2005 WL 3462725
(S.D.N.Y. Dec. 19, 2005)......................................................................................................17, 20, 21

*Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544 (2d Cir. 1978).......................16

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ........................15, 16

*Ctr. for Int'l Envtl.Law v. Office of U.S. Trade Representative*, CIV.A. 01-498 RWR,
2012 WL 640882 (D.D.C. Feb. 29, 2012) ....................................................................................14

*Donovan v. FBI*, 806 F.2d 55 (2d Cir.1986)..................................................................................14

*El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285 (D. Conn. 2008) .............................12

*Falcone v. IRS*, 479 F.Supp. 985 (E.D. Mich. 1979).......................................................................21

*Gardels v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982)............................................................................11

*Goldberg v. Dep't of State*, 818 F.2d. 71 (D.C. Cir. 1987).............................................................13

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) .......................................................................6, 12, 14

*In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) ...................................................................21, 22

*In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) .........................................................22

*In re Penn Cent. Commercial Paper Litigation*, 61 F.R.D. 453 (S.D.N.Y. 1973) ........................22

*John Doe, Inc. v. United States*, 13 F.3d 633 (2d Cir. 1994)..........................................................19

*Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141 (D.C. Cir. 2006)...............................12

*King v. U.S. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ........................................................13

*Lawyers Comm. for Human Rights v. Immigration & Naturalization Serv.*, 721 F. Supp.
552 (S.D.N.Y. 1989)...........................................................................................................................6

*Massey v. FBI*, 3 F.3d 620 (2d Cir. 1993).........................................................................................6

*Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350 (2d Cir. 2005)................... 6, 15-21, 24

*Nat'l Day Laborer Org. Network v. Immigration and Customs Enforcement*, 827 F. Supp.
2d 242 (S.D.N.Y. 2011)................................................................................................................ 20-24

*Nat'l Immigration Project of Nat'l Lawyers Guild v. U.S. Dep't of Homeland Security*, 11
Civ. 3235 (JSR), 2012 U.S. Dist. LEXIS 15029 (Feb. 7, 2012)................................................23, 24

*Navasky v. CIA*, 499 F. Supp. 269 (S.D.N.Y. 1980).......................................................................13

*Niemeier v. Watergate Spec. Prosecution Force*, 565 F.2d 967 (7th Cir. 1977)............................21

*N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)................................................................16

*Phillippi v. CIA*, 546 F.29 1009 (D.C. Cir. 1976).............................................................................5

*PHE, Inc. v. DOJ*, 983 F.2d 248 (D.C. Cir. 1993)..........................................................................16

*Pub. Citizen, Inc. v. Office of Mgmt & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010)....................17

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)...........................................................................14

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) .................................................14

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) .............................................................6

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)...........................................................................11

*Wilner v. NSA,* 592 F.3d 60, 69 (2d Cir. N.Y. 2009) ......................................................................13

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ..................................................................................11

*Wood v. FBI*, 432 F.3d 78 (2d Cir. 2005) .........................................................................................6

## *STATUTES AND LEGISLATIVE MATERIALS*

5 U.S.C. § 552(a)(4)(B) ...............................................................................................................6, 19

5 U.S.C. § 552(b)(3) ............................................................................................................................13

Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009)...........................................................12

## *OTHER AUTHORITIES*

"President Obama Hangs Out With America," White House Blog (Jan. 30, 2012),
http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america (26:30) ..........8

Interview of Leon Panetta, 60 Minutes,
http://www.cbsnews.com/video/watch/?id=7396830n (2:20-2:43) (January 29, 2012)..................9

"Defense Secretary Refers to Drone Use," *Los Angeles Times* (October 7, 2011),
*available at* http://latimesblogs.latimes.com/world_now/2011/10/us-pakistan-yemen-cia-
drones.html...........................................................................................................................................9

## **PRELIMINARY STATEMENT**

Plaintiffs The New York Times Company, Charlie Savage, and Scott Shane (jointly, "NYT") respectfully submit this memorandum of law in support of their motion for partial summary judgment on their Complaint brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and in opposition to the motion for summary judgment by the Department of Justice ("DOJ" or the "Government").

At the heart of NYT's case lies a straightforward request: that the Department of Justice's Office of Legal Counsel ("OLC") release its legal analyses addressing the legality of targeted killings of persons deemed to have ties to terrorism. NYT's two requests, coming amidst a vigorous public debate over the targeted killings that was freely joined by government officials including the President, remain unfulfilled. The requests speak to something basic to democracy: that the people should know the legal principles under which their government is operating so that they can monitor for themselves whether the administration is acting in compliance with the rule of law, appropriately safeguarding individual liberty, and fully recognizing its lawful powers to protect the national interest.

The Government, however, has declined to release the one legal memorandum it has acknowledged to be in DOJ's possession and otherwise refused to say whether any other legal analyses even exist. In defense of its position, the Government offers up a parade of horribles: operational details will be disclosed, Central Intelligence Agency ("CIA") interests will be betrayed, foreign cooperation will be curtailed, and, as a result, national security will be harmed. What the Government fails to do, however, is explain how any of those calamities follow from the disclosure of legal analysis.

To that end, NYT hopes to reorient the discussion from the Government's detour. At issue here are three core questions: (a) whether legal analysis can be properly classified; (b)

1

whether the Government has adopted the requested legal analysis as "working law"; and (c) whether so much of this legal analysis has been disclosed that any privilege preventing its disclosure has been waived. Further, to the extent that the legal analysis is contained in documents that include properly classified operational detail, the Government has not shown why the legal analysis cannot be safely segregated and disclosed. By only minimally addressing NYT's requests and focusing the Court's attention on operational data never sought by NYT, the Government has sidestepped clearly answering these questions. In fact, no FOIA exemption permits the continued withholding of the requested legal analysis.

NYT respectfully requests that the Court grant its summary judgment motion as to the one acknowledged memorandum and order the Government to provide a Vaughn index as to any other responsive legal analyses in DOJ's possession so NYT can then challenge any further withholding that is contrary to FOIA.

## FACTUAL AND PROCEDURAL BACKGROUND

Over the past two years, several senior United States Government officials – including President Barack Obama, Attorney General Eric Holder, the Assistant to the President for Homeland Security and Counterterrorism John O. Brennan, Secretary of Defense Leon Panetta, State Department Legal Adviser Harold Koh, and General Counsel of the Department of Defense Jeh Johnson – have all publicly affirmed what was long considered officially secret: that the United States has been involved in the targeted killing of alleged terrorists.

A fuller catalog of speeches and other official comments is set forth in the memorandum of law submitted by the ACLU ("ACLU Memo") in the related case. (*See* ACLU Memo at 16-23.) But the legal relevance of those statements is plain: Repeatedly, high-ranking officials have assured the American public that this once-secret program operates within the bounds of

2

established law. What is missing – and what prompted NYT's requests – is disclosure of the legal analysis supporting that conclusion. The Attorney General has explained that the Government takes into account "all relevant constitutional considerations with respect to United States citizens" and put forth a novel standard of due process under the Fifth Amendment's Due Process Clause to that end. (*See* Declaration of Sarah S. Normand, dated June 20, 2012 ("Normand Dec."), Ex. D.) Others give broader brush strokes: Legal Adviser Harold Koh tells us that "this Administration is committed to ensuring that the targeted practices that I have described are lawful" while the President assures us that the program is kept on a "tight leash." (*See* Normand Dec. Ex. F.)

While those statements may have been intended to reassure the public that all was legally right with the program, their effect was instead to fuel the public debate over the withholding of the fuller legal analyses. Current and former members of Congress joined law professors and others in publicly calling on the administration to be more forthright. (*See* Complaint ¶¶ 24-30.)

The criticism repeatedly came back to the same theme: that public understanding of the legal framework for targeted killings was essential to having public oversight and public support of the program. For instance, Jane Harman, a former United States representative and a former ranking member of the House Intelligence Committee, argued that "targeted killing of anyone should give us pause, and there has to be a legal framework around doing that. Reports say there is a lengthy memo that the Office of Legal Counsel and the Department of Justice has prepared making the case. I believe there is a good case. But I think the Justice Department should release that memo." (Declaration of Nabiha Syed, dated July 18, 2012 ("Syed Dec."), Ex. A.) Senator Dianne Feinstein, chairwoman of the Senate Select Committee on Intelligence, called on the administration to "make public its legal analysis on its counterterrorism authorities" because "for

transparency and to maintain public support of secret operations, it is important to explain the general framework for counterterrorism actions." (*Id.*, Ex. B.)

A.    Mr. Shane's FOIA Request ("Shane Request")

On June 11, 2010, *New York Times* reporter Scott Shane submitted a FOIA request to the Department of Justice Office of Legal Counsel seeking a copy of "all Office of Legal Counsel opinions or memoranda since 2001 that address the legal status of targeted killings, assassination, or killing of people suspected of ties to Al-Qaeda or other terrorist groups by employees or contractors of the United States government." (Declaration of John Bies, dated June 20, 2012 ("Bies Dec."), Ex. A.)

By letter dated October 27, 2011, DOJ OLC denied Mr. Shane's request. (*Id.*, Ex. B.) "Insofar as your request pertains to the Department of Defense," the OLC responded, all responsive records were being withheld pursuant to FOIA Exemption 1 (§ 552(b)(1), relating to national defense or foreign policy information properly classified pursuant to Executive Order No. 13,526), FOIA Exemption 3 (§ 552(b)(3), relating to information protected from disclosure by statute), and Exemption 5 (§ 552(b)(5), relating to information that is privileged). But with respect to documents pertaining to other agencies, the OLC provided a Glomar response, saying that it "neither confirms nor denies the existence of the documents described in your request," pursuant to FOIA Exemption 1, Exemption 3, and Exemption 5, because "the very fact of the existence or nonexistence of such documents is itself classified, protected from disclosure by statute, and privileged." (*Id.*)[1]

---

[1] Pursuant to the Glomar doctrine, an agency can decline to reveal whether it has responsive documents when the fact of possession or non-possession is itself exempt information under FOIA. *Phillippi v. CIA*, 546 F.29 1009 (D.C. Cir. 1976).

53556 v. 3

On November 4, 2011, NYT submitted to the Department of Justice's Office of Information Policy ("OIP") its appeal of the denial of Mr. Shane's request. (Syed Dec. ¶ 6 and Ex. E.) OIP did not respond within twenty days, as required by FOIA. (*Id.*, ¶ 8.)

B.      Mr. Savage's FOIA Request ("Savage Request")

Following the killing in Yemen of Anwar al-Aulaki, a U.S. citizen suspected of terrorist activities, Mr. Savage submitted a FOIA request to DOJ OLC on October 7, 2011 seeking a copy of "all Office of Legal Counsel memorandums analyzing the circumstances under which it would be lawful for United States armed forces or intelligence community assets to target for killing a United States citizen who is deemed to be a terrorist." (*See* Bies Dec. Ex. C.)

By letter dated October 27, 2011, on the same day Mr. Shane was sent his denial letter, DOJ OLC also denied Mr. Savage's request. (*See* Bies Dec. Ex. D.) Unlike Mr. Shane's letter, Mr. Savage's letter contained only a Glomar response – with no mention of any responsive documents concerning the Department of Defense. DOJ OLC stated that it "neither confirms nor denies the existence of the documents described in your request," pursuant to the same three exemptions cited in response to Mr. Shane. (*Id.*)

On November 4, 2011, NYT submitted to DOJ OIP its appeal of the denial of the request. (Syed Dec. ¶ 7 and Ex. F.) Again, the OIP did not respond within twenty days. (Syed Dec. ¶ 8.)

The NYT requests differ slightly in scope. The Shane Request covers those OLC opinions that relate to the legality of targeted killing of people suspected of ties to terrorist groups. The Savage Request seeks opinions that explain the legality of killing United States citizens, specifically.

## ARGUMENT

The Government's invocation of a national-security concern does not alter the well-established legal standards that apply to judicial review in a FOIA case. The court undertakes a *de novo* review of any agency's denial. 5 U.S.C. § 552(a)(4)(B); *see Halpern v. FBI*, 181 F.3d 279, 291 (2d Cir. 1999) (reviewing assertion of national-security exemption in FOIA case and finding Government's declarations inadequate); *Massey v. FBI*, 3 F.3d 620, 622 (2d Cir. 1993); *ACLU v. Dep't of Def. ("ACLU I")*, 389 F. Supp. 2d 547, 552 (S.D.N.Y. 2005) (detailing judge's responsibility to examine *de novo* if documents are withheld under national security exemption). FOIA requires the Government to disclose its records unless one of the statutory exemptions applies, and the exemptions are to be narrowly construed. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989); *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005); *Wood v. FBI*, 432 F.3d 78, 83 (2d Cir. 2005); *see also Lawyers Comm. for Human Rights v. Immigration & Naturalization Serv.*, 721 F. Supp. 552, 560 (S.D.N.Y. 1989) (exemptions are "narrowly construed to ensure that Government agencies do not develop a rubber stamp, 'top secret' mentality behind which they can shield legitimately disclosable documents"). The court's review is conducted without deference to the agency's determination. *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

## I.

## THE GOVERNMENT HAS IMPROPERLY INVOKED THE GLOMAR DOCTRINE IN REFUSING TO ACKNOWLEDGE THE EXISTENCE OF LEGAL ANALYSES OF THE GOVERNMENT'S USE OF TARGETED KILLING

There are two components to the Government's response to NYT's requests:

(1)     *An acknowledgement by DOJ that it has one relevant document pertaining to the Department of Defense (the "OLC DOD Memorandum").* The Government has withheld that document pursuant to three FOIA exemptions. (*See* Bies Dec.,

Exhibit B.) In its filings here, the Government acknowledges that the OLC DOD Memorandum pertains to the killing of al-Aulaqi in Yemen.[2]

(2) *A Glomar response as to any other legal memoranda that DOJ may have.* (*See* Bies Dec., Exs. B and D.)

Having acknowledged that DOJ has provided legal counsel to DOD on targeted killings, including al-Aulaqi, the Government provided its Glomar response only to any memoranda dealing with the CIA. (*See* Declaration of John Bennett, dated June 20, 2012 ("Bennett Dec."), ¶¶ 4-6; *see also* Government's Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Govt. Memo") at 1-2.) That response is unsustainable legally and logically.

As an initial matter, there is no ambiguity over whether the Government engages in a program of targeted killings. On January 30, 2012, President Obama, in no uncertain terms, admitted as much:

> [D]rones have not caused a huge number of civilian casualties. For the most part, they have been very precise precision strikes against al Qaeda and their affiliates. . . . This is a targeted, focused effort at people who are on a list of active terrorists who are trying to go in and harm Americans, hit American facilities, American bases, and so on.
>
> It is important for everybody to understand that this thing is kept on a very tight leash. It's not a bunch of folks in a room somewhere just making decisions. And it is also part and parcel of our overall authority when it comes to battling al Qaeda.

*See* "President Obama Hangs Out With America," White House Blog (Jan. 30, 2012), http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america (26:30).

---

[2] DOJ construed the Savage Request as "seeking OLC opinions pertaining to al-Aulaqi." (*See* Bies Dec. ¶ 11; *see also* Declaration of John F. Hackett, dated June 20, 2012 ("Hackett Dec.") ¶ 11.) The DOJ initially declined to acknowledge whether it had any documents (Syed Dec. Ex. D), but in its filings here the Government concedes that the OLC DOJ Memorandum is responsive to the Savage Request for documents pertaining to al-Aulaqi. (*See* Bies Dec. ¶ 21.)

The President's statements officially establish three facts. First, drones have been used to make multiple "precision strikes against al-Qaeda and its affiliates" – a program, in other words. Second, that there is an established procedure ("tight leash") through which this "targeted, focused effort at people who are on a list" is made. And third, that the President believes this is part of the Government's "overall authority." Attorney General Eric Holder has subsequently addressed this third point in greater detail, assuring that the program was legal and legitimate. (*See* Normand Dec. Ex. D.) . Plainly, these statements put to rest any doubt that a targeted-killing program – one governed by some legal and procedural framework – exists.

A day prior to President Obama's affirmation of the program, Defense Secretary Leon Panetta acknowledged that the CIA plays a role in targeted killings. In his interview with Scott Pelley of CBS's "60 Minutes," Secretary Panetta – who previously served as the Director of the CIA -- affirmed that the President did in fact keep a "tight leash" on the decision to target:

Pelley: So it's the requirement of the Administration, under the current legal understanding, [that] the President has to make that declaration?

Panetta: That is correct.

Pelley: Not you?

Panetta: That's correct.

Pelley: Only the President can decide?

Panetta: Well, it's a recommendation we make, it's a recommendation the CIA director makes in my prior role, but in the end when it comes to going after someone like that, the President of the United States has to sign off.

Interview of Leon Panetta, 60 Minutes, *available at* http://www.cbsnews.com/video/watch/?id=7396830n (2:20-2:43) (January 29, 2012) (emphasis added).

At a minimum, Secretary Panetta's statements establish that the CIA has a formal role in targeted killings, one in which the CIA Director is asked to "make a recommendation" to the

President on whether a declaration to target should be made. In fact, Secretary Panetta has been even more candid about the CIA's familiarity with drone use. In October 2011, Secretary Panetta spoke to troops at Naval Air Station Sigonella and explained that an operation in Libya involved "the use of Predators [a type of drone], which is something I was very familiar with in my past job [as CIA Director]." *See* "Defense Secretary Refers to Drone Use," *Los Angeles Times* (October 7, 2011), *available at* http://latimesblogs.latimes.com/world_now/2011/10/us-pakistan-yemen-cia-drones.html.

The Government cannot now credibly claim that by disclosing whether legal analyses pertaining to the CIA exist, DOJ would undermine national security by revealing CIA's interest and formal role in targeted killings. Mr. Panetta has already revealed that.

Instead, disclosure of the existence or non-existence of such analyses would reveal only one additional fact: that DOJ was (or was not) involved in the consideration of the legality of the CIA's involvement. There is no plausible explanation offered by the Government for why that fact is deserving of secrecy. The disclosure that DOJ has (or has not) weighed in on the CIA's role in targeted killing would reveal nothing that could legitimately harm national security or would reveal classified intelligence "activities, sources, or methods." (*See* Section II below concerning the Government's classification authority.)

The Government attempts to get around that conclusion by arguing that acknowledgement of the existence of the DOJ legal analysis would "tend to reveal that the CIA had the authority to directly participate in targeted lethal operations," including those aimed at U.S. citizens. (*See* Bennett Dec. ¶ 62.) Conversely, the Government asserts, if no such document existed "it would tend to reveal that the CIA did not have these authorities." (*See Id.*)

9

53556 v. 3

But why is that so? A legal memorandum may have concluded that the CIA lacks the authority to engage in targeted killing. Or it may have concluded that the agency has the authority in some circumstances but not in others. Or the writers of the memorandum could have chosen merely to summarize the law without coming to a particular conclusion in the absence of factual circumstances to which to apply the law. Or the CIA may have relied on its own legal staff to address the issues and chosen not to involve DOJ – hence, the absence of a memorandum. Or perhaps there is a DOJ memorandum concerning the CIA that was requested by the Attorney General or the White House or some other agency and therefore its existence does not even reflect any legal advice sought by the CIA. None of those scenarios runs counter to the Government's assertions that OLC memoranda are driven by particularized agency requests about specific issues. (*See* Govt. Memo at 26-27.) Merely disclosing that a memorandum pertaining to the CIA exists (or does not) reveals nothing about the CIA's legal authority – let alone whether the CIA ever acted upon it or intends to do so, the one subject that could arguably be considered a secret in certain circumstances.

For all of DOJ's assertions in this lawsuit that the very existence of the legal memoranda is itself a secret, the reality is there is no secret at all. Instead, government officials have casually and publicly referenced the existence of OLC memoranda on targeted killing. For example, in March 2012 when Senator Patrick Leahy noted that such a memorandum's release was "a matter of some debate within the Administration," the Attorney General responded with a laughing acknowledgment: "That would be true." (Syed Dec. Ex. K.) Levity and a forthright answer hardly seem like a response that would accompany the disclosure of what is characterized by the Government as a national security secret. Similarly, three months later, when Congressman Jerrold Nadler asked directly for the disclosure of "the OLC memo that reportedly provides the

53556 v. 3

legal justification for the lethal targeting of U.S. citizens who are terror subjects," Mr. Holder responded that he would "certainly look at that request." (Syed Dec. Ex. L.)[3]

Glomar is a limited exception to FOIA's broad policy of disclosure and may be used only when an agency can show that answering a FOIA inquiry "would cause harm cognizable under an FOIA exemption." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *accord Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). The Government has failed to meet that test here.

Accordingly, as to any responsive documents that were requested by NYT and subject to the Glomar response, DOJ should be directed to release them or to provide a Vaughn index cataloging the documents and the applicable FOIA exemptions so that NYT can substantively challenge their withholding.[4]

## II.

### NEITHER EXEMPTION 1 NOR EXEMPTION 3 PROVIDES A BASIS FOR WITHHOLDING LEGAL ANALYSIS UNDER FOIA

In justifying the withholding of the OLC DOD Memorandum, the Government invokes Exemption 1 (dealing with national security) and Exemption 3 (dealing with the statutory confidentiality provided under the National Security Act and the CIA Act). (*See* Govt. Memo at 3.) Yet the Government fails to cite a single case where legal analysis – not operational details and not other redactable information – is deemed to be a proper subject for classification as secret. In fact, the Government simply skips over the critical distinction between operational detail and legal analysis in its memorandum of law. Instead, it makes a blanket statement that

---

[3] Various news articles in *The New York Times*, the *Washington Post*, and elsewhere have also reported on OLC legal memoranda about the program. (See Syed Exs. G-J.)
[4] The term "Vaughn Index" originated from *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), in which the court rejected an agency's conclusory affidavit stating that requested FOIA documents were subject to exemption. *Id.* at 828.

11

"the records and information pertain to 'intelligence activities (including covert action) [and] intelligence sources or methods protected by under Section 1.4(c) of Executive Order 13256." (*See* Govt. Memo at 17.)

The declaration purporting to justify the withholding of the OLC DOD Memorandum is little more than a description of the legal standards for classification and a thread-bare assurance that the law has been followed. (*See* Declaration of Robert R. Neller, dated June 20, 2012 ("Neller Dec."), ¶¶ 17-22.) That sort of conclusory declaration has been regularly rejected as inadequate to support Exemptions 1 and 3. *See*, e.g., *Halpern*, 181 F.3d at 293 (declining to credit a declaration that "barely pretend[ed] to apply the terms of [the Executive Order governing classification] to the specific facts of the documents at hand"); *ACLU v. Office of the Dir. of Nat'l Intelligence ("ACLU II")*, No. 10 Civ. 4419 (RJS), 2011 U.S. Dist. LEXIS 132503, at \*20 (S.D.N.Y 2011) ("By proffering conclusory and nearly identical justifications for various withholdings, the government appears to assume that *de novo* FOIA review requires little more than a judicial spell check"); *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 314 (D. Conn. 2008) (rejecting summary judgment based on a declaration that "merely restates the standards promulgated in [the Executive Order]").

The Executive Order upon which the authority to classify is founded explicitly circumscribes the executive branch's power. *See* Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009). Information may be classified only if it falls within one of the categories of classifiable information set out in Section 1.4;[5] if the original classification authority determines

---

[5] Section 1.4 sets forth the following categories: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security; (f) United States Government programs for safeguarding

12

that "disclosure of the information reasonably could be expected to result in damage to the national security;" and if the authority is "able to identify or describe the damage," *id.* § 1.1. Simply put, a document must be declassified unless the Government can demonstrate that disclosure is expected to cause harm and can specify the harm that would result. *King v. U.S. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987).

Similarly, the secrecy provisions of the National Security Act, 50 § U.S.C. 403-1(i)(1), also relied upon by the Government under FOIA Exemption 3,[6] are not boundless but instead allow secrecy for "intelligence sources and methods." The same standard applies under the CIA Act, 50 U.S.C. § 403g. *ACLU I*, 389 F. Supp. 2d at 627-628. In short, it is the Government's burden to show that materials sought "logically fall[] within the claimed exemptions." *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. N.Y. 2009); *Navasky v. CIA*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) (finding that materials must "fall into the categories of 'intelligence sources and methods'" (internal citation omitted)).

The Government has failed to do that. NYT seeks only legal analysis, not the details of any operation, past or future (which can properly be subject to redaction, if necessary). Nothing about legal principles "logically falls" within the category of intelligence activities, sources, or methods. And while the courts are to give "substantial weight" to the Government's declarations (*Goldberg v. Dep't of State*, 818 F.2d. 71, 77 (D.C. Cir. 1987)), the Government is not free to get by on declarations that fail to provide an explanation for why legal analysis is logically categorized as a national security secret. *See, e.g., Halpern*, 181 F.3d at 295 (declining to accept

nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; (h) the development, production, or use of weapons of mass destruction.

[6] Exemption 3 states that FOIA does not apply to matters that are "specifically exempted from disclosure by [another] statute." 5 U.S.C. § 552(b)(3).

a "conclusory 'catch-all' assertion" that information is properly classified where Government did not provide "sufficiently specific explanation"); *Ctr. for Int'l Envtl.Law v. Office of U.S. Trade Representative*, CIV.A. 01-498 RWR, 2012 WL 640882, at *4 (D.D.C. Feb. 29, 2012) (the Government's "various arguments do not present a logical or plausible explanation for its determination [that disclosure would cause 'damage to the national security'], and the record does not support a reasonable anticipation of harm from disclosure").

Alternatively, the Government has the burden of showing why disclosable discussion of legal principles in the memorandum cannot be segregated from operational data. *See, e.g., Donovan v. FBI*, 806 F.2d 55, 58 (2d Cir.1986) (agencies must "segregate their disclosable and non-disclosable portions"); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld"); *Soucie v. David*, 448 F.2d 1067, 1077-78 (D.C. Cir. 1971) (non-exempt material may be protected only if it is "inextricably intertwined" with exempt information). DOJ's declaration, offering a conclusory sentence eschewing redaction, is inadequate to meet its burden. (*See* Neller Dec. ¶ 17.)

## III.

## EXEMPTION 5 DOES NOT PROVIDE A BASIS FOR WITHHOLDING THE THE LEGAL ANALYSIS SOUGHT BY NYT

NYT does not dispute that Exemption 5's deliberative process privilege and attorney-client privilege once applied to the OLC DOD Memorandum. The question, however, is whether those privileges still stand after the frequent disclosures of, references to, and discussions of the legal analysis that is logically the core of the memorandum.

14

The legal analysis requested by NYT has been adopted by the Government as "working law," and adoption vitiates both the deliberative process privilege and the attorney-client privilege. Furthermore, because so much of this analysis has already been disclosed publicly, the Government should be deemed to have waived these privileges.

### A. Adoption of the Legal Analysis Behind Targeted Killing Defeats the Deliberative Process and Attorney-Client Privileges

The Government maintains that that "[n]o Executive Branch official has publicly invoked, much less expressly adopted or incorporated as a statement of agency policy, any OLC opinion or other deliberative memorandum containing legal analysis." (*See* Govt. Memo at 40.) There are two problems with this assertion: It is hinged on an inappropriately narrow legal test, and it is implausible. Precedent puts to rest the Government's belief that only an express or explicit admission of adoption or incorporation constitutes adoption, and it defies belief to think that the officials – including the Attorney General – were not invoking and relying upon OLC opinions when they gave speeches about the legal justification of the targeted-killing program.

#### 1. *Deliberative Process Privilege*

Once a privileged document becomes the basis of official governmental policy and is used by the executive branch in its dealings with the public, it is subject to disclosure under FOIA. The words of the D.C. Circuit apply with full force here: "Even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *see also La Raza*, 411 F.3d at 356-57 (same).

In FOIA jurisprudence, this principle has become embodied in the term "working law" or "secret law" – a simple, but powerful concept holding that Exemption 5 privileges cannot be

15

used to shield from the public the law or policies under which the executive branch is operating. The public does not have to be subjected to "trust me" government in which officials know the law they are applying but are immune from having to share the operative details. *See Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 548 (2d Cir. 1978) (FOIA requires release of a document that "sets forth or clarifies an agency's substantive or procedural law," lest it render that working law "secret law").

The working law doctrine extends to executive branch policies and practices that do not meet the strict definition of "law." *See N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (recognizing the "affirmative congressional purpose to require disclosure of documents that have 'the force and effect of law'"); *see also Coastal States Gas*, 617 F.2d at 869 ("working law" or "secret law" consists of agency guidance or precedent applied by agency staff in their dealings with the public); *PHE, Inc. v. DOJ*, 983 F.2d 248, 252 (D.C. Cir. 1993) (secret law is "materials that define standards for determining whether the law has been violated").

*La Raza*, 411 F.3d 350, maps out the operative analysis. The FOIA plaintiffs there sought disclosure of a DOJ OLC memorandum concerning local law enforcement of the civil provisions of federal immigration law. As it has done here, DOJ asserted that memorandum was shielded from disclosure by Exemption 5's privileges. *Id.* at 352. The Second Circuit, in determining whether those privileges had been obviated by the adoption of the memorandum as policy, relied on the straightforward principle derived from the Supreme Court's decision in *Sears*: Where " 'the reasons which supply the basis for an agency policy [are] actually adopted, [t]these reasons constitute the working law. . ." *La Raza*, 411 F.3d at 360 (quoting *Sears*, 421 U.S. at 152-153) (internal quotation marks omitted).

16

The court pointed to such factors as the "repeated references to the OLC memorandum made by the Attorney General and his high-ranking advisors, the substance of their comments, and the way in which their comments were used – that is, to assure third parties as to the legality of the actions the third parties were being urged to take." *La Raza*, 411 F.3d at 357; *see also Pub. Citizen, Inc. v. Office of Mgmt & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010) (Exemption 5 inapplicable because document reflecting OMB policy on how it carries out its responsibilities is not predecisional or deliberative). Disclosure was required because the government was using the OLC memo as the legal authority for the agency's claim that its new policy "had a basis in the law." *La Raza*, 411 F.3d at 359.

This court need not find any "magic language" or explicit admission of reliance to set aside the deliberative process privilege, contrary to the Government's assertions. (*See* Govt. Memo at 39.) *La Raza* specifically eschews a bright-line test – one in which "a document may be deemed expressly adopted or incorporated only in the event that an agency, in essence, uses specific explicit language of adoption or incorporation" – "because courts must examine all the relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred." *La Raza*, 411 F.3d at 357, fn. 5 (internal citations omitted).

In fact, as in *Bronx Defenders v. Dep't of Homeland Security*, 04 Civ. 8576 (HB), 2005 U.S. Dist. LEXIS 33364 (S.D.N.Y. Dec. 19, 2005), adoption can be premised on only implicit reliance on a document's legal analysis. The court in *Bronx Defenders* rejected the government's contention that adoption had to be explicit – or, as the court framed it, that "absent some sort of magic language where the decision-making agency admits reliance on the reasoning in addition to the conclusions of a document, the standard has not been met." *Id.* at 19. Instead, the court

17

found implicit reliance demonstrated by an acknowledgment by the agency that it sought the OLC's advice and some evidence that the agency followed that advice. *Id.*

Similarly, in *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U. S. DOJ*, 09 Civ. 8756 (VM), 2011 U.S. Dist. LEXIS 99121 (S.D.N.Y. Aug. 29, 2011), this court examined whether the Department of Health and Human Services ("HHS") and the United States Agency for International Development ("USAID") had adopted reasoning and analysis from several OLC memoranda as their agencies' working law. In making the determination, the court looked at the actual function of agency policy, despite any label of "tentative" or "draft" on the OLC's advice. *Id.* at 18. Where the agencies derived "their marching orders and the rationale for those orders" from OLC advice, that advice operated as a statement of working law and disclosure was required. *Id.*

Here, the Government has affirmatively assured the public that its review of the law supports the legality of the killings. In his speech at Northwestern, the Attorney General said:

> [I]t is entirely lawful – under both United States law and applicable law of war principles – to target specific senior operational leaders of al-Qaeda and associated force. . . . Now, it is an unfortunate but undeniable fact that some of the threats we face come from a small number of United States citizens who have decided to commit violent attacks against their own country from abroad. Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during this current conflict, it's clear that United States citizenship alone does not make such individuals immune from being targeted.

(Normand Dec. Ex. D.)

The Attorney General's speech – a public explanation by an executive official expressly designed to convey the legal justification for a policy decision already made – fits comfortably into *La Raza*'s definition of working law. Concededly, because of the secrecy surrounding the document, we cannot say definitively that Mr. Holder's speech tracks perfectly the legal analysis

18

contained in the OLC DOD Memorandum. But the Government asks plaintiffs and the Court to engage in fantastic thinking if it wants us to believe that the Attorney General and other responsible officials are articulating legal concepts that differ substantially from DOJ's considered written legal analysis of the issue. To the extent there is doubt about the confluence of the statements made by public officials and the OLC DOD Memorandum, we ask that the Court review the memoranda *in camera* under 5 U.S.C. § 552(a)(4)(B).

The Attorney General's motivation in speaking about the legal basis for targeted killing is also a critical consideration. As he said: "The American people can be – and deserve to be – assured that actions taken in their defense are consistent with their values and their laws." (Normand Dec. Ex. D.) Precisely it. Where an explanation is made "to assure third parties as to the legality of the actions the third parties were being urged to take," disclosure should follow. *La Raza*, 411 F.3d at 357. "Adopt[ing] a legal position while shielding from public view the analysis that yielded that position is offensive to FOIA." *Id.* at 360.

### 2. Attorney- Client Privilege

The same principles apply to the governmental attorney-client privilege. Adoption vitiates the privilege for documents that reflect actual agency policy:

> Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy. In such circumstances, the principal rationale behind the attorney-client privilege – "to promote open communication between attorneys and their clients so that fully informed legal advice may be given," like the principal rationale behind the deliberative process privilege, evaporates; for once an agency adopts or incorporates document, frank communication will not be inhibited.

*La Raza*, 411 F.3d at 360-61 (citing *John Doe, Inc. v. United States*, 13 F.3d 633, 635-36 (2d Cir. 1994)).

District courts here have affirmed the *La Raza* approach. *See Brennan*, 2011 U.S. Dist. LEXIS 99121 at *20 (because the government "incorporated the OLC Memoranda into HHS's

19

and USAID's official policy, the attorney-client privilege cannot be invoked to bar the OLC Memoranda's disclosure"); *Bronx Defenders*, 2005 U.S. Dist. LEXIS 33364 at *7 ("Because the deliberative privilege has evaporated…the attorney-client privilege may not be invoked to protect" it) (quoting *La Raza*, 411 F.3d at 361 (internal quotation marks and alterations omitted)); *see also Nat'l Day Laborer Org. Network v. Immigration and Customs Enforcement*, 827 F. Supp. 2d 242, 252 (S.D.N.Y. 2011) ("A predecisional document can lose that status if it is adopted, formally or informally, as the agency position…The same logic applies to documents otherwise protected by the attorney-client privilege").

In *Nat'l Day Laborer*, for example, the Department of Homeland Security tried to invoke the privilege with respect to a memorandum discussing a federal immigration enforcement program, even after many of the memorandum's components already appeared in some public document or statement by the defendants. *Nat'l Day Laborer Org. Network v. Immigration and Customs Enforcement*, 827 F. Supp. 2d 242, 260 (S.D.N.Y. 2011). The court found that in an "instance where the agency has continually relied upon and repeated in public the arguments made in the Memorandum," the attorney-client privilege could not stand. *Id.* at 259. Similarly, *Bronx Defenders* echoes the reasoning of *La Raza*: "The Government will not be allowed 'to make public use of [a document] when it serves [its own] ends but claim the attorney-client privilege when it does not.'" *Bronx Defenders*, 2005 U.S. Dist. LEXIS 33364 at *21-22 (citing *La Raza*, 411 F.3d at 360).

Contrary to the Government's rendering of the law (*see* Govt. Memo at 39), the cases cited above demonstrate that an express or explicit statement of incorporation is not required. Instead, adoption was found in a variety of circumstances where, as here, the Government embraced legal analysis as policy. For instance, in *Brennan*, observing that evidence of adoption

20

53556 v. 3

"may not be as explicit as *La Raza*," the court examined public statements made by government officials and letters to determine that USAID and HHS had in fact adopted as agency policy the reasoning and analysis from an OLC memorandum. Because there was "little doubt" that the agencies relied on and employed this analysis, the attorney-client privilege could not stand. *Brennan*, 2011 U.S. Dist. LEXIS 99121 at *18-19. And the court in *Nat'l Day Laborer* affirmed *La Raza* in saying that "there is no bright-line test to determine adoption" and thus examined both public statements and e-mails to determine whether ICE had relied upon the arguments made in the requested memorandum to inform a newly implemented policy. *Nat'l Day Laborer*, 827 F. Supp. 2d at 259.

These cases are founded on the principle that the governmental attorney-client privilege operates differently when the underlying legal advice is driving policy rather than protecting communications between a governmental lawyer and client in litigation. *See In re County of Erie*, 473 F.3d 413, 418 n. 5 (2d Cir. 2007). The typical legal protections associated with private attorney-client relationships apply in the latter situation, but legal policy advice stands on a different footing and its protection is decidedly more limited, as *La Raza*, 411 F.3d at 360-61, shows. Were that not so, "a broad attorney-client privilege would permit legal opinions, recognized as authoritative interpretations within the agency, to be hidden from the public." *Falcone v. IRS*, 479 F. Supp. 985, 989-90 (E.D. Mich. 1979); *see also County of Erie*, 473 F.3d at 418 n.5 (citing *Falcone*). Such legal opinions "are not the ideas and theories which go into the making of the law, they are the law itself, and as such should be made available to the public." *Niemeier v. Watergate Spec. Prosecution Force*, 565 F.2d 967, 974 (7th Cir. 1977).

53556 v. 3

## B. Both Processes Privileges Have Also Been Waived

While adoption fully resolves the question of Exemption 5's applicability, there is a

second independent ground for finding that the exemption no longer is operative: waiver.[7]

The Government correctly observes that the purpose of the attorney-client privilege is to

"encourage attorneys and their clients to communicate fully and frankly…" (*See* Govt. Memo at

36.) But that rationale for confidentiality disappears where there has been "a deliberate decision

to disclose privileged materials in a forum where disclosure was voluntary and calculated to

benefit the disclosing party." *In re Grand Jury Proceedings*, 219 F.3d 175, 184 (2d Cir. 2000);

see also *In re Penn Cent. Commercial Paper Litigation*, 61 F.R.D. 453, 463 (S.D.N.Y. 1973)

("the voluntary disclosure or consent to the disclosure of a communication, otherwise subject to

a claim of privilege, effectively waives the privilege").

The court's reasoning in *Nat'l Day Laborer*, 827 F. Supp. 2d at 259, is instructive here.

There, the Department of Homeland Security tried to invoke the privilege with respect to a

memorandum even after many of the memo's components had already been disclosed by the

agency. Officials had undertaken a public campaign that echoes the one undertaken here to

assure the public of the legality of a program:

> [O]fficials discussed the legal justification for making Secure
> Communities mandatory with elected officials, immigrant advocates, and
> other law enforcement agencies at various times during 2010 and 2011.
> Some of these discussions were general, referring simply to the
> "Congressional mandate" for information sharing. However, a number of
> these discussions were more specific. . . .On August 5, 2011, John
> Sandweg, Counselor to the Secretary of DHS, participated in a conference
> call with approximately one hundred people from the immigrant-rights
> advocacy community. On that phone call, when asked about the legal
> authority for mandating participation in the program, Sandweg said that
> agency lawyers had determined that section 1722 of Title 8 of the United

---

[7]  While the rationale for disclosure under a waiver theory closely tracks the rationale underlying
adoption, waiver turns on the fact of disclosure and can occur in instances where the legal
memorandum was not part of the decision-making leading to adoption.

> States Code provided the authority for the FBI and ICE to share
> information about a person's criminal history, which is relevant to a
> person's deportability.

*Id.* at 259. The court reasoned that that where "factual information, legal analysis, and legal conclusions in the Memorandum have been disclosed to the public," the agency has "failed to meet its burden of proving that confidentiality was maintained." *Id.* at 257.

As with adoption, an explicit mention of the underlying document is not necessary to find waiver of attorney-client privilege. *See Nat'l Immigration Project of Nat'l Lawyers Guild v. U.S. Dep't of Homeland Security*, 11 Civ. 3235 (JSR), 2012 U.S. Dist. LEXIS 15029 at *20, n. 9 (Feb. 7, 2012). In *Nat'l Immigration Project*, the court held that an agency policy was contained only in a singular, four-page e-mail chain. It was of no import that the agency did not explicitly cite the e-mail chain in its discussion of the policy because requiring an explicit reference to the sourcing would create "perverse incentives" for agencies to artfully hide their reliance on foundational documents. *Id.* at *20, n. 9. Instead, the court used the simple and customary standard: "the attorney-client privilege attaches only where information was intended to be and was in fact kept confidential." *Id.* at *20.

Not every discussion of legal analysis gives rise to waiver of the governmental attorney-client privilege. But in the context of policy formulation (as opposed to litigation), where an agency is affirmatively asserting that there is a legal basis for a governmental action, and the legal analysis is shared in significant part, then waiver will be found. *See Id.* at *19-20; *Nat'l Day Laborer*, 827 F. Supp. 2d 242 at 255.

Here, Mr. Holder laid out in his speech a specific legal theory upon which targeted killings were being justified: that Fifth Amendment guarantees of due process can be satisfied absent judicial process. (*See* Normand Dec. Ex. D.) Mr. Koh similarly provided the operative

23

53556 v. 3

legal analysis when he said "a state that is engaged in armed conflict or in legitimate self-defense is not required to provide targets with legal process before the state may use lethal force." Mr. Koh emphasizes that the United States' use of lethal force is "conducted in accordance with all applicable law," including law of war principles such as distinction and proportionality. (*See* Normand Dec. Ex. F.)

I defies belief that the cornerstone legal principles being articulated by these officials were not also the heart of the OLC DOD Memorandum. To the extent that there are questions about the degree of similarity, *in camera* review is the proper next step.

The attorney-client privilege under Exemption 5 is to be "narrowly construed and is limited to those situations in which its purpose will be served." *Coastal States Gas*, 617 F.2d at 862. The privilege's purposes are not served where the legality of a policy has been put into public issue, and secrecy serves only to deny the public the ability to assess the strength or weakness of the legal analysis being relied upon.

Similarly, the even-less-robust deliberative process privilege is also waived by the disclosures. A prerequisite of invoking the deliberative process privilege is that the information remain within the confines of the privileged internal governmental group, and the privilege is lost where, as here, disclosure is made to external third parties. *Nat'l Council of La Raza v. Dep't of Justice*, 339 F. Supp. 2d 572, 585 n. 87 (S.D.N.Y. 2004) ("another way an agency may waive an Exemption 5 privilege for a document is to disclose the substance of a document outside the Executive Branch"), *aff'd on other grounds*, 411 F.3d 350 (2005).

53556 v. 3

## CONCLUSION

For each of these reasons, NYT respectfully asks this Court to (i) grant its cross-motion for partial summary judgment and deny the Government's motion for summary judgment; (ii) declare that the OLC DOD Memorandum is public under 5 U.S.C. § 552 and order DOJ to provide the memorandum to NYT within 20 business days of the Court's order, or, alternatively, conduct an *in camera* review to determine which portions of the memorandum may be segregated for release; (iii) direct DOJ to provide a Vaughn index as to any additional documents that were subject to the Glomar response and permit further challenge to any withholding that may be brought by NYT in this Court; (iv) award NYT the costs of this proceeding, including reasonable attorney's fees, as expressly permitted by 5 U.S.C. § 552(a)(4)(E); and (v) grant such other and further relief as the Court deems just and proper.

Dated: New York, NY
       July 18, 2012

Respectfully submitted,

By: _____

David E. McCraw
Nabiha Syed
Legal Department
The New York Times Company
620 8th Avenue - 18th Floor
New York, NY 10018
phone: (212) 556-4031
fax: (212) 556-1009
e-mail: mccraw@nytimes.com
Counsel for Plaintiffs

25

53556 v. 3