UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
THE NEW YORK TIMES COMPANY,                    :
CHARLIE SAVAGE, and SCOTT SHANE,               :
                                               :
                                               :
            Plaintiffs,                        :
                                               :
                                               :
            v.                                 :        11 Civ. 9336 (CM)
                                               :
                                               :
UNITED STATES DEPARTMENT OF                    :
JUSTICE,                                       :
                                               :
                                               :
            Defendant.                         :
------------------------------------------------------------- x
AMERICAN CIVIL LIBERTIES UNION and             :
THE AMERICAN CIVIL LIBERTIES UNION             :
FOUNDATION,                                    :
                                               :
                                               :
            Plaintiffs,                        :
                                               :
                                               :
            v.                                 :
                                               :        12 Civ. 794 (CM)
                                               :
U.S. DEPARTMENT OF JUSTICE, including its      :
component the Office of Legal Counsel, U.S.    :
DEPARTMENT OF DEFENSE, including its           :
component U.S. Special Operations Command,     :
and CENTRAL INTELLIGENCE AGENCY,               :
                                               :
                                               :
            Defendants.                        :
------------------------------------------------------------- x

**COMBINED OPPOSITION TO PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY
JUDGMENT AND REPLY IN FURTHER SUPPORT OF GOVERNMENT'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.      The Agencies Properly Withheld Records and Information Pursuant to
           Exemptions 1 and 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          A.     The Information Withheld Under Exemption 1 Pertains to
                the Categories Protected by Executive Order 13526. . . . . . . . . . . . . . . . . . 2

          B.     Disclosure of the Information Withheld Under Exemption 1
                Could Reasonably Be Expected to Harm National Security. . . . . . . . . . . 6

          C.     The Agencies Properly Withheld Information Under Exemption 3. . . . . 9

    II.     The Agencies Have Not Officially Acknowledged Any
           Withheld Records or Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          A.     Plaintiffs Point to No Instance Where an Authorized Public Official
                Has Acknowledged the Exact Information Being Withheld . . . . . . . . . . . 10

               1.     The Agencies Have Neither Confirmed Nor Denied
                     CIA Involvement in the Use of Lethal Force to
                     Target Individuals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

               2.     The Agencies Have Not Officially Acknowledged
                       the Nature, Depth or Breadth of Any Involvement in
                       the Death of Anwar al-Aulaqi. . . . . . . . . . . . . . . . . . . . . . . . . 15

               3.     The Agencies Have Not Confirmed or Denied the
                       Existence of an OLC Memorandum About Aulaqi. . . . . . . . . . . 18

          B.     No Amount of Unsourced Statements or Statements by
                  Former Officials Can Waive the Agencies' Ability
                  to Protect Classified Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

               1.     Unsourced News Reports and Statements of Former
                       Officials Are by Definition Unofficial and Insufficient to
                       Constitute Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

               2.     Multiple Non-Acknowledgments Cannot Collectively
                       Equal Official Acknowledgment. . . . . . . . . . . . . . . . . . . . . . . . 23

III.    The OLC Opinion Pertaining to DOD and the Legal Memoranda
        Withheld by DOD Are Privileged and Protected by Exemption 5. . . . . . . . . . . . 24

        A.    Plaintiffs Have Not Shown That Any Agency Official Expressly
              Adopted the DOD OLC Memorandum as the Policy of the Agency. . . . . 24

              1.    The Adoption Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              2.    Plaintiffs' Erroneous Theory of Adoption. . . . . . . . . . . . . . . . . . 28

              3.    Plaintiffs Erroneously Rely on District Court Decisions
                    That Are Inconsistent with Supreme Court and Second
                    Circuit Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

              4.    The DOD OLC Memorandum Does Not Constitute
                    Agency "Working Law" or "Secret Law". . . . . . . . . . . . . . . . . . 36

        B.    Plaintiffs Have Not Shown Any Waiver of Exemption 5's
              Protection Through Public Disclosure of the DOD
              OLC Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

              1.    Plaintiffs Fail to Establish That Any Executive
                    Branch Official Has Publicly Disclosed the
                    DOD OLC Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

              2.    Plaintiffs Fail to Establish Any Other Conduct
                    That Would Vitiate the Attorney-Client Privilege. . . . . . . . . . . . 41

        C.    The ACLU Fails to Establish Any Express Adoption of the
              DOD Legal Memoranda or Waiver Through Public Disclosure. . . . . . . . 43

IV.     The Agencies Conducted Reasonable Searches. . . . . . . . . . . . . . . . . . . . . . . . . 44

        A.    OLC Conducted a Reasonable Search. . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        B.    OIP Conducted a Reasonable Search. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        C.    DOD Conducted a Reasonable Search. . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        D.    The CIA's Declaration Is More Than Sufficient. . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## TABLE OF AUTHORITIES

*Cases***:**                                                                                      **Page**

*ACLU v. DOD,*
     628 F.3d 612 (D.C. Cir. 2011). .............................................................. 8, 15, 20

*ACLU v. DOJ,*
     808 F. Supp. 2d 280 (D.C. Cir. 2011).................................................... *passim*

*ACLU v. DOJ,*
     681 F.3d 61 (2d Cir. 2012).................................................................... *passim*

*ACLU v. Dep't of State,*
     — F. Supp. 2d —, 2012 WL 2989833 (D.D.C. July 23, 2012)................................. 20, 21

*Access Reports v. DOJ,*
     926 F.2d 1192 (D.C. Cir. 1991). ..................................................................... 26

*Afshar v. Dep't of State,*
     702 F.2d 1125 (D.C. Cir. 1983). .................................................................. *passim*

*Anderson v. Dep't of State,*
     661 F. Supp. 2d 6 (D.D.C. 2009). ..................................................................... 46

*Assassination Archives & Research Ctr. v. CIA,*
     334 F.3d 55 (D.C. Cir. 2003). .......................................................................... 39

*Baldrige v. Shapiro,*
     455 U.S. 345 (1982)....................................................................................... 23

*Bassiouni v. CIA,*
     392 F.3d 244 (7th Cir. 2004). ......................................................................... 49

*Brinton v. Dep't of State*,
     636 F.2d 600 (D.C. Cir. 1980). ................................................................... 37, 38

*Brennan Center for Justice v. DOJ,*
     No. 09 Civ. 8756(VM), 2011 WL 4001146 (S.D.N.Y. Aug. 21, 2011). ........................ 34

*Bronx Defenders v. DHS,*
     No. 04 Civ. 8576(HB), 2005 WL 3462725 (S.D.N.Y. Dec. 19, 2005)...................... 34, 35

*CIA v. Sims,*
     471 U.S. 159 (1985)........................................................................................ 3, 9

*Citizens for Responsibility & Ethics in Washington v. Office of Admin.*,
    249 F.R.D. 1 (D.D.C. 2008)............................................................................... 38

*Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.D. Cir. 1980)................................................................... 37, 38

*Davis v. DOJ*,
    968 F.2d 1276 (D.C. Cir. 1992). ....................................................................... 39

*Elec. Privacy Info. Ctr. v. NSA*,
    678 F.3d 926 (D.C. Cir. 2012). ......................................................................... 49

*Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*,
    443 U.S. 340 (1979).......................................................................................... 42

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990). ........................................................................... 7

*Florida House of Representatives v. Dep't of Commerce*,
    961 F.2d 941 (11th Cir. 1992). ......................................................................... 39

*Friends of Blackwater v. Dep't of Interior*,
    391 F. Supp. 2d 115 (D.D.C. 2005). ................................................................ 48

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999). ..................................................................... 7, 20

*Garcia v. DOJ*,
    181 F. Supp. 2d 356  (S.D.N.Y. 2002)............................................................. 45

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982). ......................................................................... 4

*Grand Central Partnership, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999)...................................................................... *passim*

*In re County of Erie*,
    473 F.3d 413 (2d Cir. 2007)...................................................................... *passim*

*In re Grand Jury Proceedings*,
    219 F.3d 175 (2d Cir. 2000)............................................................................. 42

*In re Lindsey*,
    148 F.3d 1100 (D.C. Cir. 1998). ...................................................................... 39

*Halpern v. FBI,*
181 F.3d 279 (2d Cir. 1999) .................................................................................. 48

*Jarvik v. CIA,*
741 F. Supp. 2d 106 (D.D.C. 2010). ...................................................................... 49

*Leeds v. Comm'r of Patents & Trademarks,*
955 F.2d 757 (D.C. Cir. 1992). .............................................................................. 37

*Lewis v. DOJ,*
609 F. Supp. 2d 80 (D.D.C. 2009). .................................................................. 49, 50

*Mobil Oil Corp. v. EPA,*
879 F.2d 698 (9th Cir. 1989). ........................................................................... 39, 40

*Moore v. CIA,*
666 F.3d 1330 (D.C. Cir. 2011). ............................................................................ 10

*Nation Magazine v. U.S. Customs Serv.,*
71 F.3d 885 (D.C. Cir. 1995). ................................................................................ 47

*Nat'l Council of La Raza v. DOJ,*
411 F.3d 350 (2d Cir. 2005) ........................................................................... *passim*

*Nat'l Day Laborer Organizing Network v. ICE,*
827 F. Supp. 2d 242 (S.D.N.Y. 2011) ........................................................ 34, 36, 40

*Nat'l Immigration Project of Nat'l Lawyers Guild v. DHS,*
No. 11 Civ. 3235 (JSR), 2012 WL 375515 (S.D.N.Y. Feb. 7, 2012). ............. 40, 41

*NLRB v. Sears, Roebuck & Co.,*
421 U.S. 132 (1975) ...................................................................................... *passim*

*Navasky v. CIA,*
499 F. Supp. 269 (S.D.N.Y. 1980) ........................................................................... 4

*New York Times Co. v. DOJ,*
__ F. Supp. 2d __, 2012 WL 1869396 (S.D.N.Y. May 17, 2012). ........................... 6

*Phillippi v. CIA,*
546 F.2d 1009 (D.C. Cir. 1976). ............................................................................. 21

*Phillippi v. CIA,*
 655 F.2d 1325 (D.C. Cir. 1981). ................................................................... 10

*Renegotiation Bd v. Grumman Aircraft Eng'g Corp,*
 421 U.S. 168 (1975). ................................................................... 25, 26, 38

*Students Against Genocide v. Dep't of State,*
 257 F.3d 828 (D.C. Cir. 2001). ................................................................... 8

*Tigue v. DOJ,*
 312 F.3d 70 (2d Cir. 2002) ................................................................... 26, 29, 33

*Vest v. Dep't of Air Force,*
 793 F. Supp. 2d 103 (D.D.C. 2011). ................................................................... 46

*Weissman v. CIA,*
 565 F.2d 692 (D.C. Cir. 1977). ................................................................... 4

*Wilner v. NSA,*
 592 F.3d 60 (2d Cir. 2009) ................................................................... 6, 7, 21

*Wilson v. CIA,*
 586 F.3d 171 (2d Cir. 2009) ................................................................... *passim*

*Wolf v. CIA,*
 473 F.3d 370 (D.C. Cir. 2007). ................................................................... 10, 15, 23, 49

*Wood v. FBI,*
 432 F.3d 78 (2d Cir. 2005) ................................................................... 26-28, 30

**Statutes:**

5 U.S.C. § 552(a)(2) ................................................................... 25

5 U.S.C. § 552(b). ................................................................... 23

22 U.S.C. § 7631(f). ................................................................... 34

**Miscellaneous:**

Designation of ANWAR AL-AULAQI Pursuant to Executive Order 13224 and
 the Global Terrorism  Sanctions Regulations, 75 Fed. Reg. 43233 (July 23,
 2010). ................................................................... 15

vi

*President Obama Hangs Out With America*, White House Blog (Jan. 30, 2012),
http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america. ................... 14

*60 Minutes*, http://www.cbsnews.com/video/watch/?id=7396830n. ........................................... 17

*U.S.: Defense Secretary Refers to CIA Drone Use*, L.A. Times, Oct. 7, 2011, *available at*
http://lat.ms/roREDq. ................................................................................................................... 14

**PRELIMINARY STATEMENT**

The American Civil Liberties Union ("ACLU") and *New York Times* plaintiffs do not seriously dispute the facial applicability of FOIA Exemptions 1, 3 and 5 to the classified and privileged information that the defendant agencies have sought to protect in this case. Instead, plaintiffs oppose the government's motion for summary judgment in large part by espousing two distinct and novel theories of waiver, neither supported by law. Plaintiffs' first theory of waiver would deprive the government of the ability to protect information that is properly classified. Although the government can waive the protections governing classified information through an official disclosure into the public domain of exactly the same information being withheld, plaintiffs point to not a single such instance of official acknowledgment. Instead, plaintiffs resort to inference and supposition in an effort to establish what otherwise does not exist on its own. Even more remarkably, plaintiffs argue that an accumulation of non-acknowledgments and unofficial remarks can together satisfy the exacting specificity required for official acknowledgment and waiver. But under the law of FOIA, as under the law of mathematics, zero plus zero will always equal zero. Plaintiffs cannot establish waiver by reciting an "avalanche" of news reports, none of which on its own establishes an official disclosure.

Plaintiffs' second theory of waiver pertains to the protection of the agencies' confidential legal advice under Exemption 5. Eschewing Supreme Court and Second Circuit law in favor of non-binding (and incorrectly decided) district court decisions, plaintiffs argue that the privileges protecting confidential legal advice are waived through the mere inference that the advice has been adopted as agency policy. Plaintiffs' arguments regarding adoption are directly refuted by the Second Circuit's decisions holding that adoption must be express, and must adopt the reasoning of the advice and not just its conclusion. Here, it is undisputed that no public official has referred

publicly to any legal memoranda authored by the Office of Legal Counsel on the subject of targeting, nor to any legal memoranda by the Department of Defense with respect to the same subject. Nor do these confidential legal memoranda constitute "secret law." Far from constituting a final agency rule or policy affecting the substantive rights of the public, confidential and candid legal advice is the very essence of the deliberative process. Compelled disclosure of confidential OLC advice based simply on an inference that a client agency may have followed OLC's advice would not only cause harm to the government in this case, but it would inhibit OLC's overall mission as the government's confidential legal adviser. This Court should reject plaintiffs' invitation to deviate from established law by adopting such a novel and damaging theory of adoption and waiver.

Apart from plaintiffs' flawed theories of waiver, plaintiffs offer little resistance to the applicability of the government's claimed exemptions. There is little question that the information withheld pursuant to Exemptions 1 and 3 pertains to intelligence activities, sources and methods and satisfies each requirement of the governing Executive Order. Plaintiffs' own prognostication that disclosure of the withheld information would nevertheless not result in damage to the national security is entitled to no weight. Conversely, the Executive Branch's predictive judgments in the realm of national security and intelligence are entitled to substantial deference. Accordingly, for all the reasons set forth below and in the government's opening memorandum and declarations, the defendant agencies are entitled to summary judgment.

## ARGUMENT

**I.    The Agencies Properly Withheld Records and Information Pursuant to Exemptions 1 and 3**

**A.    The Information Withheld Under Exemption 1 Pertains to the Categories Protected by Executive Order 13526**

Plaintiffs concede that all the information protected by the agencies pursuant to Exemption

2

1 was classified by an original classification authority and is under the control of the United States. Plaintiffs dispute only whether the information falls within the protected categories of information under Executive Order 13526, Section 1.4, and whether the classification authority has adequately described the harm to national security that would result from disclosure. Primarily, plaintiffs argue that the use of targeted lethal force does not fall within the category of "intelligence activities (including covert operations) [and] intelligence sources or methods" because "targeted killing is not an intelligence source or method." ACLU Opposition Brief ("ACLU Opp.") at 39-42. This argument is a red herring, however, because plaintiffs do not contest that the withheld information falls comfortably within the other protected categories under the Executive Order, including Section 1.4(d) – "foreign relations and foreign activities of the United States" – and Section 1.4(a) – "military plans, weapons systems, or operations." *See* Government's Opening Brief ("Gov't Br.") at 19. Accordingly, the Court need not determine whether the information also falls within the subsection for intelligence activities, sources or methods.

To the extent the Court reaches the question, however, the protected information clearly pertains to intelligence activities, sources, and methods. *See* Gov't Br. at 17-21. In *CIA v. Sims*, the Supreme Court directed that "intelligence sources and methods" be interpreted broadly to encompass any sources and methods related to foreign intelligence, including an "infinite variety of diverse sources." 471 U.S. 159, 169-73 (1985), *cited in* ACLU Opp. at 40-41. Nowhere does the Court suggest that the power to protect intelligence activities, sources and methods is strictly limited to the direct revelation of identities of particular sources of data. Indeed, the Court noted specifically that, "Congress intended to give the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process." *Id*. at 170; *see also ACLU v. DOJ,* 681 F.3d 61, 73-74 (2d

3

Cir. 2012) (reiterating broad authority of intelligence agencies); *Gardels v. CIA*, 689 F.2d 1100, 1104

(D.C. Cir. 1982) (finding that foreign intelligence agencies could deduce sources and methods from

CIA's interest in a particular university).[1]

Plaintiffs appear not to dispute that certain aspects of the ACLU request directly seek

intelligence information. *See* Gov't Br. at 17; Bennett Decl. ¶¶ 47-48; ACLU Request at 4(b)

(seeking "facts supporting a belief that al-Awlaki could not be captured or brought to justice using

nonlethal means"), 5 (asking "whether U.S. Government personnel were aware of [Samir Kahn's]

proximity to al-Awlaki at the time the missiles were launched").  Moreover, as explained in detail

in the Bennett Declaration, the volume and details of responsive records, if disclosed, would

generally reveal intelligence sources and methods.  Bennett Decl. ¶¶ 31, 40-56.  For example,

"disclosing the degree to which the CIA is interested in the U.S. Government's efforts to counter the

threat posed by certain senior-level terrorists who have U.S. citizenship would tend to reveal the

level of the CIA's intelligence interest in this group of individuals and the relative success (or lack

thereof) of the CIA's intelligence collection efforts directed against them – information that squarely

implicates intelligence-gathering methods and operational activities." *Id*. at 52.  Additionally, to

confirm or deny the existence or nonexistence of OLC opinions related to the CIA would tend to

---

[1] The other cases that plaintiffs cite are equally unavailing.  In *Weissman v. CIA*, the D.C. Circuit rejected the specific claim of a *law enforcement exemption* because the CIA was not authorized to conduct domestic law enforcement functions.  *See* 592 F.2d 692, 694, 694-96 (D.C. Cir. 1977).  The court, however, upheld the applicability of Exemptions 1 and 3 in general, and noted that on remand the CIA "may well be able to show that the claim of exemption (b)(3) alone . . . is sufficient to protect the [same information] against disclosure . . . ." *Id*. at 698.  In *Navasky v. CIA*, the court held that the identities of authors, books and publishers engaged in acknowledged CIA propaganda efforts were not themselves intelligence sources and methods, but nonetheless noted that nondisclosure could be justified if the disclosure of such identities would lead to disclosure of sources and methods.  *See* 499 F. Supp. 269, 274-75 (S.D.N.Y. 1980).  Here, the agencies have explicitly and reasonably tied the Glomar and No Number, No List responses to the disclosure of sources and methods.

reveal intelligence activities (which, pursuant to section 1.4(c) of E.O. 13526, may include "covert action" in addition to traditional intelligence-gathering activities), *i.e.*, whether or not CIA had the authority to directly participate in targeted lethal operations. *See* Bennett Decl. ¶¶ 62-65; *see also* Neller Decl. ¶¶ 22, 26; Hackett Decl. ¶¶ 22-28.[2]

Plaintiffs' strawman – that "killing" is not a "source or method" – thus misconstrues the appropriate standard under Exemption 1. That standard requires only that classified information "pertain to" the protected categories. *ACLU v. DOJ*, 681 F.3d at 70; *see also* Bennett Decl. ¶¶ 42, 50 (explaining that disclosure would tend to identify sources and that hostile groups analyze public information to deduce valuable intelligence). The U.S. District Court for the District of Columbia accepted a similar explanation in a recent case where the ACLU sought CIA records about drone strikes. *See ACLU v. DOJ*, 808 F. Supp. 2d 280, 289-93 (D.D.C. 2011) ("Plaintiffs' argument that a program of drone strikes cannot form the basis of, or involve, intelligence sources or methods also ignores the scope of the CIA's specific authority to engage in activities beyond 'traditional' intelligence gathering (however defined), such as intelligence activities and operations, covert operations, and foreign relations activities." (citing E.O. 12333)), *appeal pending*, No. 11-5320 (D.C. Cir.).[3]

---

[2] The *New York Times* argues that to reveal the existence of any such OLC memoranda would not necessarily reveal whether or not the CIA had authority to conduct strikes. New York Times Opposition Brief ("N.Y. Times Opp.") at 10. As explained in the Bennett and Hackett Declarations, however, OLC generally only provides opinions when there is a concrete need for advice. Accordingly, revealing that there are opinions related to CIA would tend to suggest something very different than revealing that there is legal analysis generally. To go further and reveal the number and subjects of any OLC opinions related to CIA would reveal still more information about the depth and breadth of any CIA involvement. And if OLC opinions did not exist related to CIA (even though there is one related to DOD), it would tend to suggest that there is a lack of interest or authority. *See* Bennett Decl. ¶¶ 62-65; Hackett Decl. ¶¶ 23-24.

[3] Oral argument in this appeal is scheduled for September 20, 2012.

Plaintiffs also argue that legal analysis in the acknowledged OLC memorandum pertaining to DOD does not fall within a protected category. *See* N.Y. Times Opp. at 11-14. Exemption 1, however, contains no exception for legal analysis, and documents containing such analysis may be properly classified so long as they meet the criteria of the Executive Order. *See, e.g.*, *New York Times Co. v. DOJ*, — F. Supp. 2d —, 2012 WL 1869396, at *5-*6 (S.D.N.Y. May 17, 2012) (rejecting argument by *New York Times* and ACLU that classified report by Attorney General and Director of National Intelligence to Congress contained analysis of government's authority under Section 215 of the Patriot Act, and therefore could not properly be withheld under Exemption 1 or 3 because it constituted "secret law"). As explained in the Bies Declaration, moreover, the memorandum at issue contains "advice to the Attorney General, for his use in interagency deliberations, regarding a potential military operation in a foreign country." Bies Decl. ¶ 30; *see also* Hackett Decl. ¶ 24 (OLC generally provides legal opinions only when there is a concrete need for advice). It is therefore entirely logical and plausible that the legal opinion contains information pertaining to military plans, intelligence activities, sources and methods, foreign government information, and foreign relations. Neller Decl. ¶ 22; *see Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009). Documents located by DOJ were also reviewed by ODNI, which confirmed that such documents must be withheld in full to protect these categories of information. Hackett Decl. ¶¶ 29-30.

    **B.**    **Disclosure of the Information Withheld Under Exemption 1 Could Reasonably Be Expected to Harm National Security**

The ACLU devotes a portion of its brief to explaining why the ACLU does not believe that disclosure of the withheld information would cause damage to national security. Plaintiffs' views in that regard are wholly beside the point. Decades of established law recognize the Executive

Branch's unique expertise in matters of national security and intelligence, and courts, let alone private litigants, are ill-equipped to second-guess the Executive's predictive judgments in these areas. *See Wilner*, 592 F.3d at 76 ("Recognizing the relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies"), *quoted in ACLU v. DOJ*, 681 F.3d at 70-71; *accord Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990).

For example, the ACLU expresses the view that disclosure of the withheld information would cause no harm to the United States' relationship with Yemen or other countries. ACLU Opp. at 45-46. The ACLU, however, is not in a position to know what damage may or may not occur in the sensitive arena of foreign affairs. Indeed, this is precisely the sort of second-guessing that courts routinely reject. *See Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (explaining that "foreign governments can often ignore unofficial disclosures of CIA activities that might be viewed as embarrassing or harmful to their interests" but "cannot . . . so easily cast a blind eye on official disclosures made by the CIA itself"); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). Instead, the extensive declarations submitted by the government – both on the public record and *ex parte, in camera*[4] – are entitled to substantial weight, *ACLU v. DOJ*, 681 F.3d at 69, and are more than sufficient to meet the standards of Executive Order 13526.[5]

---

[4] The *New York Times* complains that the Neller Declaration is too conclusory to support withholding of the OLC opinion pertaining to DOD, *see* N.Y. Times Opp. at 12, but ignores the additional justifications provided by OLC, *see* Bies Decl. ¶¶ 30, 43-45, and ODNI, *see* Hackett Decl. ¶¶ 21-30, as well as the government's classified declarations.

[5] Plaintiffs speculate that the damage to national security could be mitigated through redactions. ACLU Opp. at 45. But the agencies have established through detailed declarations that revealing the volume, dates and other basic identifying information about responsive documents would

Even were it appropriate to consider plaintiffs' views (which it is not), plaintiffs' own judgment as to the potential harm to national security turns entirely on their incorrect supposition that the government has officially confirmed the withheld information. ACLU Opp at 42-48. As discussed below and in the government's opening brief, no such confirmation has occurred, and the law recognizes that in terms of harm to national security, the distinction between official and unofficial disclosures is critical. *See* Point II, *infra*; Gov't Br. at 20-22 (describing variety of harms to national security that would result from official disclosure). The district court in *ACLU* rejected an identical attempted end-run around the standard for waiver. *See ACLU v. DOJ*, 808 F. Supp. 2d at 300 (the argument "that the information withheld by the CIA is so widely disseminated that it could not cause harm to national security is foreclosed by our requirement . . . that information be officially acknowledged" (quoting *ACLU v. DOD*, 628 F.3d 612, 625 (D.C. Cir. 2011)) (internal quotation marks omitted)). It is well established, moreover, that the fact that some information related to a certain subject exists in the public domain "does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001).

Because there has been no official confirmation, and because the agencies' declarations amply demonstrate the likely harm to national security that would result from disclosure, plaintiffs' challenges to the agencies' Exemption 1 withholdings are easily rejected.

---

itself cause harm to national security by tending to compromise intelligence activities, sources and methods, foreign liaison relationships, the depth and breadth of particular agencies' interest in particular operations, and other information. *See* Bennett Decl. ¶¶ 31-36, 48, 52; Neller Decl. ¶¶ 25-26; Hackett Decl. ¶¶ 21-28. Moreover, Lt. Gen. Neller established in his declaration that the classified information in the DOD OLC Memorandum is not reasonably segregable. Neller Decl. ¶ 17.

C.      The Agencies Properly Withheld Information Under Exemption 3

Plaintiffs do not contest that the withheld information could reveal a "function" of the CIA protected under the CIA Act. The CIA Act does not limit its protection of CIA functions to intelligence sources and methods. *See* Gov't Br. at 25; *see also ACLU v. DOJ*, 808 F. Supp.2d at 287-89 (holding that request for records related to drone strikes could reveal functions of the CIA). Thus, plaintiffs' argument that the withheld information is not an intelligence source or method subject to protection under the CIA Act or the National Security Act is of little moment.

Nevertheless, to the extent plaintiffs challenge the application of Exemption 3 based on the National Security's Act broad coverage for intelligence sources and methods, plaintiffs' objections are meritless. As discussed in the context of Exemption 1, the declarations leave no doubt that disclosure of the withheld information would tend to reveal intelligence activities, sources and methods. *See supra* at 2-6. The agencies' declarations are entitled to substantial deference in this regard. *See Sims*, 471 U.S. at 179; *ACLU v. DOJ*, 681 F.3d at 69, 73. Furthermore, as explained in the agencies' opening brief, Gov't Br. at 23, neither the CIA Act nor the National Security Act requires a showing of harm to national security. Thus, the Court can uphold the agencies' reliance on those statutes and Exemption 3 without reaching the question of whether release of the information would cause damage to national security.

II.     The Agencies Have Not Officially Acknowledged Any Withheld Records or Information

Plaintiffs devote the bulk of their efforts to arguing not that the withheld records and information fall outside the claimed exemptions, but that the agencies have waived their ability to rely on those exemptions due to their supposed official acknowledgment of the information at issue. Plaintiffs, however, cannot come close to meeting what even they recognize as an exacting standard

9

for official disclosure.  Pursuant to that well-accepted standard, an agency does not waive the protections of Exemptions 1 or 3 unless an authorized government official, acting in his or her official capacity, unambiguously discloses to the public the precise information that is being sought. Official acknowledgment, accordingly, cannot be implied.  *See* Gov't Br. at 28-29; ACLU Opp. at 13; *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (under "strict test" for official disclosure, "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure" (citing *Wilson*, 586 F.3d at 186)).  Indeed, "[i]n the highly sensitive context involving issues of national security . . . an agency's official acknowledgment cannot be based on speculation, no matter how widespread."  *Moore*, 666 F.3d at 1334 (citation, internal quotation marks, and alterations omitted); *see also Wolf v. CIA*, 473 F.3d 370, 379 (D.C. Cir. 2007); *Phillippi v. CIA*, 655 F.2d 1325, 1331 (D.C. Cir. 1981); *Afshar*, 702 F.2d at 1130-31.  In this case, none of the statements plaintiffs rely on, either alone or in combination, comes close to meeting the demanding standard required for waiver.

### A.    Plaintiffs Point to No Instance Where an Authorized Public Official Has Acknowledged the Exact Information Being Withheld

Plaintiffs incorrectly contend that the agencies have officially acknowledged three discrete "facts": (1) "the existence of the targeted killing program"[6] (2) "the legal analysis supporting its use against U.S. citizens," and (3) "the killing of [Anwar] al-Awlaki." ACLU Opp. at 14.[7]  To the

---

[6] Plaintiffs do not define, and it is otherwise unclear from their response, what is meant by "targeted killing program."

[7] Plaintiffs do not argue that the government has officially acknowledged any particular information about the circumstances surrounding the deaths of Samir Khan or Abdulrahman al-

contrary, the government has acknowledged only that it possesses some responsive records reflecting a general U.S. government interest in the legal basis for the possible use of lethal force against U.S. citizens, and the process by which U.S. citizens could be designated for targeted lethal force. *See* Gov't Br. at 7-8.[8]  On the other hand, the defendant agencies (1) have not confirmed or denied the authority or involvement of the CIA with respect to any potential use of targeted lethal force against individuals; (2) have not confirmed or denied any particular operations targeting U.S citizens, and (3) have not confirmed or denied the existence of any Office of Legal Counsel advice relating to Anwar al-Aulaqi.  In short, defendants have not acknowledged the depth or breadth of any interest in the particular individuals or operations about which plaintiffs seek information.

### 1.    The Agencies Have Neither Confirmed Nor Denied CIA Involvement in the Use of Lethal Force to Target Individuals

None of plaintiffs' purported "disclosures" establishes official acknowledgment of CIA involvement in the use of targeted lethal force against individuals.  The U.S. District Court for the District of Columbia recently rejected a similar argument, upholding the CIA's Glomar response to a request for records about alleged drone strikes.  After reviewing nearly the identical record presented by the ACLU in this case, the court found that "Plaintiffs seek exactly what is not publicly available – an official CIA acknowledgment of the fact that it is or is not involved in the drone strike program."  *See ACLU v. DOJ*, 808 F. Supp. 2d at 296.  The court continued:

> Even were the public to believe this to be a foregone conclusion, the statements cited by Plaintiffs demonstrate that the CIA has carefully and specifically refused to acknowledge any role or interest in such program.  To the contrary of demonstrating public disclosure, the tenor, deliberate ambiguity, and explicit disclaimers of

---

Aulaqi.

[8]  Because of this acknowledgment, the defendant agencies have not asserted a blanket "Glomar" response to requests concerning the potential use of lethal force in counterterrorism operations.

11

involvement in targeted attacks in the statements cited by Plaintiffs further illustrate this point.

*Id*. at 297.  This Court should reach the same conclusion.

First, plaintiffs selectively quote from remarks made by then-CIA Director Panetta before the Pacific Council on International Policy on May 18, 2009, during a question and answer session.  The more complete discussion is as follows:

> Q [Audience member]: . . . You mentioned that you believe the strategy in Pakistan is working – the President's strategy in Pakistan in the tribal regions, which is the drone – the remote drone strikes.  You've seen the figures recently from David Kilcullen and others that the strikes have killed 14 midlevel operatives and 700 civilians in collateral damage.  And his assessment as a counterinsurgency expert is it's creating more anti-Americanism than it is disrupting al-Qaeda networks.
>
> And then secondly, President Musharraf told me when he was in office that the Pakistan nukes are safer than those in the former Soviet Union.  Do you agree with that?  Safely guarded – more safely guarded?
>
> A [Panetta]: . . . On the first issue, obviously because these are covert and secret operations I can't go into particulars.  I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage.  I know that some of the – sometimes the criticisms kind of sweep into other areas from either plane attacks or attacks from F-16s and others that go into these areas, which do involve a tremendous amount of collateral damage.  And sometimes I've found in discussing this that all of this is kind of mixed together.  But I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership.

*See* Wicker Decl., Exh. 4, at 6.  Read in context, Panetta did not disclose any protected information.  Panetta expressly declined to discuss any specific operations, and he neither confirmed nor denied CIA involvement in targeting operations.  Indeed, Panetta's statement does not even explicitly acknowledge whether the U.S. government is involved in such operations.

Rather than point to an express acknowledgment as the law requires, plaintiffs' argument

rests instead on inferences about what they believe Panetta meant based on the question and surrounding context. The district court in *ACLU* rejected a similar argument after the ACLU argued that this same quotation revealed CIA involvement in "drone strikes." The *ACLU* court explained that, "[e]ven if Director Panetta were speaking squarely on the issue of drone strikes, he never acknowledged the CIA's involvement in such program. That Director Panetta acknowledged that such a program exists and he had some knowledge of it, or that he was able to assess its success, is simply not tantamount to a specific acknowledgment of the CIA's involvement in such program, nor does it waive the CIA's ability to properly invoke Glomar." *ACLU v. DOJ*, 808 F. Supp. 2d at 294. Plaintiffs' suggestion that Director Panetta intended to disclose classified information at this informal question and answer session, despite his statement that "I can't go into particulars" and the lack of any express reference to CIA involvement, flies in the face of the Second Circuit's admonition that "the law will not infer official disclosure of information classified by the CIA." *Wilson*, 586 F.3d at 186.

The two other Panetta statements provided by plaintiffs are similarly unavailing. In a *Wall Street Journal* article, Panetta is quoted as saying that an al-Qaida leader "was hit." Wicker Decl., Exh. 11, at 1. Nothing in the quotation indicates any admission of U.S. government involvement, much less CIA involvement. Indeed, the article specifically states that Panetta refused to "speak directly to the circumstances of the death." *Id*. at 2. Similarly, Panetta's statement in an ABC News interview does not constitute an official disclosure. That interview was part of an extended conversation about U.S. government strategy in Afghanistan and Pakistan and other national security issues. Wicker Decl., Exh. 12, at 3. In response to a question about Osama Bin Laden, Panetta indicated that "we continue to disrupt Al Qaida's operations" and "we are engaged in the most

13

aggressive operations in the history of the CIA in that part of the world." *Id*.  As the district court

in *ACLU* explained, "Director Panetta's comments lacked a specific reference to any particular CIA

action except that the CIA was involved in undefined, aggressive operations in Pakistan," and

"Director Panetta's references to 'we' or 'our' could have just as easily referred to the joint efforts

of all U.S. military and civilian resources dedicated in Afghanistan and Pakistan." *ACLU v. DOJ*,

808 F. Supp. 2d at 296.[9]

Lastly, plaintiffs point to remarks by President Obama in January 2012 in which he discussed

the use of lethal force against al-Qaida.  ACLU Opp. at 17-20.  As previously explained, while public

officials have discussed the general topic of targeted lethal operations, they have been careful to

avoid any discussion of operational details.  *See* Gov't Br. 1-3, 7-8, 29-30 & Normand Decl., Exhs.

D-E.  These statements by the President are no exception.  *See* video cited at Wicker Decl. ¶ 26;

*President Obama Hangs Out With America*, White House Blog (Jan. 30, 2012),

http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america.        Plaintiffs

speculate that the President must have been speaking about CIA involvement in lethal operations.

They base this inference on the President's reference in the video to drone strikes in the Federally

Administered Tribal Areas of Pakistan, combined with unsourced media reports from *Al Jazeera* and

---

[9]  Plaintiffs also refer to two vague Panetta quotations about Predator drones made after he was no longer CIA Director.  *See* Wicker Decl., Exhs. 6, 8.  Contrary to plaintiffs' suggestion, those vague statements do not constitute official confirmation of CIA records relating to the use of lethal force.  As for Panetta's aside, "although Predators aren't bad," this statement is too ambiguous to constitute an official disclosure that the CIA possesses responsive records concerning drone strikes.  Even if this comment could be read as suggesting that Predators were somehow available to the CIA (which the government does not concede), it cannot be construed as specifically acknowledging that the Agency uses them for lethal purposes, as opposed to some other possible purpose, such as surveillance and intelligence-gathering.  Indeed, even the article acknowledged that "Panetta stopped short of confirming that CIA Predators were conducting airstrikes." *U.S.: Defense Secretary Refers to CIA Drone Use*, L.A. Times, Oct. 7, 2011, *available at* http://lat.ms/roREDq.

the *Washington Post* stating that DOD does not conduct drone strikes in Pakistan.  *See* ACLU Opp. at 18 n.14.  Plainly, this sort of speculation based on a purported mosaic of media reports is insufficient to support a claim of official disclosure.  *See Wilson*, 586 F.3d at 186 ("the law will not infer official disclosure"); *Wolf*, 473 F.3d at 378 (insisting "on exactitude" before finding an official disclosure); *ACLU v. DOD*, 628 F.3d at 621; *ACLU v. DOJ*, 808 F. Supp. 2d at 297 ("the statements of journalists, 'experts,' or even unofficial or unidentified sources (even were they CIA personnel) are not 'official' disclosures by the CIA").  Certainly, the President said nothing about the CIA and nothing about particular operations.  Because plaintiffs have identified no statement in which an official either confirmed or denied CIA involvement in lethal targeting operations, the agencies have not waived their ability to protect such information pursuant to FOIA's exemptions.  *See Wilson*, 586 F.3d at 186.

### 2.    The Agencies Have Not Officially Acknowledged the Nature, Depth or Breadth of Any Involvement in the Death of Anwar al-Aulaqi

Plaintiffs claim that defendants have officially disclosed information about the use of lethal force against Anwar al-Aulaqi.  ACLU Opp. at 18-21.  The agencies have not asserted a blanket Glomar as to any and all information related to Aulaqi; rather, they have declined to describe or identify documents in their possession responsive to the requests about particular individuals because, as explained above, *see* Point I.B, *supra*, to do so would reveal information that could reasonably be expected to harm national security.  Plaintiffs have not identified any official acknowledgment that specifically matches this protected information.

First, plaintiffs point to a general quotation from then-CIA Director Panetta that Aulaqi is "clearly someone that we're looking for."  Wicker Decl., Exh. 21, at 1.  But Panetta's interest in a senior operational leader of al-Qaida like Aulaqi did not identify U.S. government involvement in

15

any alleged operation.  It instead expressed only a widely acknowledged general U.S. government interest in Aulaqi, which is unsurprising given his leadership role in a terrorist organization.  *See* Designation of ANWAR AL-AULAQI Pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations, 75 Fed. Reg. 43233 (July 23, 2010).

Second, an American Forces Press Service article inaccurately referenced Secretary Panetta as stating that a U.S. airstrike killed Anwar al-Aulaqi.  *See* Wicker Decl., Exh. 14.  The article included a link to the actual transcript of Panetta's remarks in a question-and-answer session with the Canadian Minister of Defense and the press:

> Q:  Mr. Secretary, what can you tell the American people about the role of the U.S. military in tracking and killing Anwar al-Awlaki? Were there U.S. military boots on the ground?  And any information you can give us about the specifics of the attack.
>
> SEC. PANETTA:  Well, this has been a bad year for terrorists. You know, we -- we just have seen a major blow -- another major blow to al-Qaida, someone who was truly an operational arm of al-Qaida in this node of Yemen.  And, you know, we had always had tremendous concern that after getting bin Laden, that someone like Awlaki was a primary target because of his continuing efforts to plan attacks against the United States.
>
> As we know, he was involved in the Detroit bombing, he was involved in the cargo bombing efforts.  He continued to try to inspire people to terrorize this country and to attack this country. And so this country is much safer as a result of the loss of Awlaki.
>
> As far as the operational elements here, I'm not going to speak to those except to say that we've been working with the Yemenis over a long period of time to be able to target Awlaki, and I want to congratulate them on their efforts, their intelligence assistance, their operational assistance to get this job done.

Wicker Decl., Exh. 22.  From the transcript, it is clear that Panetta did not confirm or deny the allegation that the U.S. government conducted the strike on Aulaqi.  Indeed, he specifically refused

16

to comment on "operational elements," and went out of his way to note the efforts of the Yemenis.

Although the American Forces Press Service may be associated with DOD, it is not an original classifying authority, and its inaccurate characterizations of what the head of the agency said cannot constitute an official acknowledgment, particularly given Panetta's consistent refusal to confirm or deny this very information. Plaintiffs' insistence that Panetta's response shows that Aulaqi was a "primary target of the U.S." and that "he was killed in a U.S. strike" plainly is not drawn from the text, but from plaintiffs' own inferences and speculation. Panetta said neither of those things and explicitly refused to comment on any operational element connected to Aulaqi's death. *Id.*

Plaintiffs also attempt to infer a waiver from Panetta's appearance on *60 Minutes*, in which he was asked about the death of Aulaqi. *See* http://www.cbsnews.com/video/watch/?id=7396830n. According to plaintiffs, he "nodded" in response to an allegation that he killed Aulaqi, and later discussed in general terms the decision-making regarding whether to target a U.S. citizen. Plaintiffs' interpretation of Panetta's nod is clearly incorrect, because Panetta specifically declined to comment on the operation. Indeed, Secretary Panetta nods throughout the interview whenever the interviewer asks a question. His later discussion of the general power to target U.S. citizens engaged in terrorist operations against the United States overseas is in no sense a disclosure related to any specific operation.[10]

---

[10] Plaintiffs also rely on the general statements made by the President about Aulaqi's death during public remarks at the White House and on *The Tonight Show with Jay Leno*, comments which the government addressed at length in its opening brief. *See* Gov't Br. at 31-32; Normand Decl., Exh. H & Wicker Decl., Exh. 5. Plaintiffs attempt to dismiss the government's explanation as "absurd," ACLU Opp. at 20, yet they point to nothing that precisely acknowledges what plaintiffs believe. Because speculation can never equate to official disclosure, *see Wilson*, 586 F.3d at 186, plaintiffs cannot establish a waiver through these remarks.

Finally, plaintiffs point to several speeches by Executive Branch officials about targeted lethal operations generally. *See* ACLU Opp. at 22-23 (citing speeches by Holder, Johnson, Preston, Brennan, and Koh). As explained in the government's opening brief, these speeches were carefully and intentionally calibrated to disclose as much as possible about the justification for targeted lethal operations against al-Qaida leaders without confirming or denying any information about alleged specific operations or programs or otherwise revealing information that would harm national security. *See* Gov't Br. 1-3, 7-8, 29-30 & Normand Decl., Exhs. D-E. In none of these speeches did any of those officials disclose the specific information that the agencies now seek to protect, and plaintiffs can point to no quotation to the contrary. *See* Gov't Br. at 29-31.

### 3. The Agencies Have Not Confirmed or Denied the Existence of an OLC Memorandum About Aulaqi

Plaintiffs claim that the government has acknowledged the existence of an OLC memorandum specifically about operations against Aulaqi, relying on a question by Senator Leahy, a misinterpreted phrase in one of the agency declarations, and a variety of unsourced and unofficial statements in the media. None of these, either individually or collectively, is sufficient to satisfy the strict test for waiver.

First, plaintiffs cite to a *New York Times* article reporting part of an exchange between Senator Leahy and Attorney General Holder that occurred during the course of a congressional budget hearing. *See* Wicker Decl., Exh. 15, 18 (transcript of hearing). In a short exchange, Senator Leahy referenced the Attorney General's speech "regarding drones and targeting U.S. Citizens," and asked the Attorney General for "the Office of Legal Counsel memorandum." Senator Leahy then remarked, "I realize that's a matter of some debate within the administration." Holder responded by saying, "[t]hat would be true." Wicker Decl., Exh. 18 at 24. Neither Senator Leahy nor the

18

Attorney General discussed the content of the purported memorandum that only Senator Leahy mentioned, and even Senator Leahy did not characterize it as being about Aulaqi. Indeed, Holder did not even explicitly indicate that there was a memorandum, only that there was some debate in the administration about how to respond to Leahy's request. *Id.*

Plaintiffs' reliance on this particular article quoting the budget hearing is particularly curious. The article is titled, "A Not-Quite Confirmation of a Memo Approving Killing," and was authored by one of the plaintiffs in this case, Charlie Savage. Wicker Decl., Exh. 15. In the body of the article, Mr. Savage wrote: "Mr. Holder's affirmation of Mr. Leahy's remarks was ambiguous and fell short of explicit acknowledgment . . . ." *Id.* Given this concession that the Attorney General's statement did not constitute official acknowledgment, plaintiffs cannot credibly urge this Court to find to the contrary. Similarly, Attorney General Holder's response to Congressman Nadler, that he would "look at that request," is not an acknowledgment of anything. Wicker Decl., Exh. 20, at 38.

Plaintiffs' second attempt to find waiver, posited by the *New York Times,* argues that OLC admitted the existence of a memorandum about Aulaqi in the defendants' motion for summary judgment. N.Y. Times Opp. at 7 & n.2. This contention is wholly specious. Plaintiffs cite to the portion of the Bies Declaration where the declarant indicated that, for the purposes of the original administrative response, OLC interpreted the Savage request as seeking opinions about Aulaqi, because the request itself asserted that "this matter is of pressing public interest because of the recent death in Yemen of [Aulaqi]." Bies Decl. ¶ 10 & Exh. D. For that very reason, OLC originally, and appropriately, responded with a Glomar response. *Id.* ¶ 11. There is, however, a broader interpretation of the Savage request, and in describing the one acknowledged OLC memorandum, the declarant employed the broader reading of the request that did not link it to Aulaqi. *See id.* ¶¶ 21,

19

30; *see also id.* ¶¶ 15, 34-38 (OLC initially interpreted ACLU request as pertaining to three specified individuals, but then employed broader interpretation of request in describing responsive documents). The government has never, in the Bies Declaration or otherwise, confirmed or denied that this memorandum pertains to Aulaqi. To the contrary, the government has explicitly refused to confirm or deny whether it has any OLC opinions or other responsive documents pertaining to Aulaqi. Gov't Br. at 2, 14; Bennett Decl. ¶ 37; Hackett Decl. ¶ 24.

Finally, plaintiffs point to an unsourced media report that purports to describe an OLC memorandum about Aulaqi and alleged CIA operations. Plaintiffs concede, as they must, that such an alleged "leak" cannot form the basis of a waiver. *See* ACLU Opp. at 29. The case law is copious and explicit that official acknowledgment must come from official sources, speaking intentionally, and disclosing the precise information at issue. *See Wilson,* 586 F.3d at 186-87; *Frugone v. CIA*, 169 F.3d at 774; *ACLU v. DOD*, 628 F.3d at 620-21. In one case, for example, where a FOIA requester alleged that the precise document at issue had been previously leaked and was widely available in the public domain, a district court refused to force the agency to publicly acknowledge a document that had not been officially disclosed. *See ACLU v. Dep't of State*, — F. Supp. 2d —, 2012 WL 2989833, at *6 (D.D.C. July 23, 2012) ("No matter how extensive, the WikiLeaks disclosure is no substitute for an official acknowledgment and the ACLU has not shown that the Executive has officially acknowledged that the specific information at issue was a part of the WikiLeaks disclosure."). Here, too, an unsourced and unofficial account of a purported OLC memorandum about Aulaqi cannot constitute an official acknowledgment, and therefore cannot result in a waiver of the protections of Exemptions 1 or 3.

**B.** **No Amount of Unsourced Statements or Statements by Former Officials Can Waive the Agencies' Ability to Protect Classified Information**

**1.** **Unsourced News Reports and Statements of Former Officials Are by Definition Unofficial and Insufficient to Constitute Waiver**

Plaintiffs cite to what they characterize as "dozens" of articles, and a "veritable avalanche" of stories, containing unsourced information about targeted lethal operations, as well as statements by unnamed and former government officials. *See* ACLU Opp. at 24, 26-30. In *Wilson*, however, the Second Circuit held unequivocally that unofficial statements cannot constitute disclosure that compromises classification:

> [There is] "a critical difference between official and unofficial disclosures" of information classified by the CIA. As a practical matter, foreign governments can often ignore unofficial disclosures of CIA activities that might be viewed as embarrassing or harmful to their interests. They cannot, however, so easily cast a blind eye on official disclosures made by the CIA itself, and they may, in fact, feel compelled to retaliate. Mindful of this reality, the law will not infer official disclosure of information classified by the CIA from (1) widespread public discussion of a classified matter; (2) statements made by a person not authorized to speak for the Agency; or (3) release of information by another agency, or even by Congress.

586 F.3d at 186 (internal citations omitted).

Plaintiffs claim, inaccurately, that there have been no cases in which there was such widespread media reporting about a classified issue. ACLU Opp. at 24. To the contrary, multiple cases have presented analogous circumstances. In *Wilner v. NSA*, for example, there was widespread media discussion of the Terrorist Surveillance Program, whose existence was acknowledged but whose operational details were not. *See* 592 F.3d at 70. And in *Phillippi v. CIA*, 546 F.2d 1009, 1010-11 (D.C. Cir. 1976), the requesters sought access to CIA records about the Hughes Glomar Explorer, which had been widely discussed in the media. Courts have uniformly rejected similar

21

arguments. *See Wilson*, 586 F.3d at 187-88 (finding no official disclosure of Valerie Plame Wilson's purported employment record at the CIA despite widespread media reporting); *ACLU v. DOJ*, 808 F. Supp. 2d at 293-98 (finding no official disclosure of alleged CIA involvement in drone strikes despite widespread media reporting); *ACLU v. Dept. of State*, 2012 WL 2989833, at *1 (finding no official disclosure of document published on WikiLeaks).  None of these efforts to infer official disclosure from media reporting has succeeded; nor should plaintiffs' attempt here.[11]

Nevertheless, plaintiffs point to a book by reporter Daniel Klaidman that claims, based on unknown sources, that some unidentified number of alleged leaks are intentional disclosures by the Administration, notwithstanding the many official refusals to confirm or deny the very same information.  *See* Wicker Decl., Exh. 17.  Yet, the one incident that the book recounts purporting to represent such an "intentional" leak (according to unknown sources) is wholly unrelated to the subject matter of this case.  Such unsourced allegations, unrelated to the actual requests at issue, are obviously insufficient to show an intentional waiver in light of the overwhelming evidence of the existing policy against disclosure and multiple sworn statements.  *See* Bennett Decl. ¶¶ 66-68, Neller Decl. ¶ 27.  Plaintiffs' insinuation that widespread media speculation regarding details of targeted lethal operations is itself proof of official disclosure is simply not supported by the record or the case law.

---

[11]  Plaintiffs also argue – frivolously – that *counsel* has revealed the number of responsive documents ("many") and thus has disclosed the depth and breadth of interest in this matter.  *See* ACLU Opp. at 15 n.12.  In counsel's letter to the Court (Wicker Decl., Exh. 2), counsel revealed only that the agencies were processing documents, "many" of which were classified.  Such statements clearly do not reveal the number of documents actually determined to be responsive to any particular request, do not reveal the existence of any documents related to CIA, and do not reveal the depth and breadth of the interest of any particular agency in any particular individual.

###### 2.      Multiple Non-Acknowledgments Cannot Collectively Equal Official Acknowledgment

Unable to identify any specific disclosure by an authorized public official that matches precisely the information withheld here, plaintiffs resort to a novel theory of "collectivity" that is unsupported by either law or reason. Under plaintiffs' theory, even if no one statement meets the demanding standard for waiver, official acknowledgment can still occur where there have been many such unofficial statements. *See* ACLU Opp. at 24. The volume of alleged unofficial disclosures is simply not the test for official disclosure. To the contrary, the law is uniform in demanding that waivers be official, intentional and precisely matched to the specific information requested; under no circumstance, therefore, may official acknowledgment be inferred. *See, e.g., Wilson*, 586 F.3d at 186; *Wolf*, 473 F.3d at 378. It defies reason to suggest that many statements that fail to meet this exacting standard may be combined to effectuate a successful waiver. Moreover, it is telling that, despite the "veritable avalanche" of reports to which plaintiffs cite, they can point to not a single report with the exact information plaintiffs hope to find.

Finally, having failed to identify any specific official disclosure that matches the information withheld here, plaintiffs fall back on generalities about FOIA, claiming that defendants are engaging in "selective disclosure" by disclosing the general justification for targeted lethal operations through Executive Branch officials but not disclosing other information. Certain legislators may have identified selective disclosure as one reason to enact FOIA, but the legislative solution was to put the government to its proof., *i.e.*, to require agencies to justify exemptions. The defendant agencies have done so here, and those exemptions have not been waived through official disclosure. *See* 5 U.S.C. § 552(b); *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982) (recognizing that "public disclosure is not always in the public interest"); *accord ACLU v. DOJ*, 681 F.3d at 69.

**III.    The OLC Opinion Pertaining to DOD and the Legal Memoranda Withheld by DOD Are Privileged and Protected by Exemption 5[12]**

Plaintiffs concede that the OLC opinion pertaining to DOD (the "DOD OLC Memorandum") was a privileged deliberative and attorney-client communication when it was created.  N.Y. Times Opp. at 14; ACLU Opp. at 48 (adopting arguments of *New York Times*).  Their sole argument for disclosure of this admittedly privileged document is that the memorandum was "expressly adopted" as agency policy and waived through public disclosure, even though no government official has *ever* invoked the memorandum in the government's dealings with the public, much less as the basis for agency policy.  In addition to being directly contrary to Supreme Court and Second Circuit precedent, plaintiffs' sweeping interpretation of the adoption and waiver doctrines could have a profoundly detrimental effect on government decisionmaking and transparency – by discouraging policymakers from seeking and relying on confidential legal advice in the course of formulating policy, or publicly discussing the legal bases for their policies – and should be rejected.

**A.    Plaintiffs Have Not Shown That Any Agency Official Expressly Adopted the DOD OLC Memorandum as the Policy of the Agency**

**1.    The Adoption Doctrine**

The adoption doctrine had its genesis in the Supreme Court"s decision in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975).  In *Sears*, the general counsel of the National Labor Relations Board was responsible for deciding whether to initiate a proceeding in response to a

---

[12]  The ACLU has abandoned any claim to the other documents withheld by the agencies pursuant to Exemption 5, either explicitly, *see* ACLU Opp. at 48 n.44 (stating that ACLU is not seeking disclosure of eight other documents listed on DOD's *Vaughn* index, the four records listed on OIP's *Vaughn* index, or the sixty emails listed on OLC's *Vaughn* index), or by failing to respond to the government's motion, *see* Gov't Br. at 38-43 (asserting Exemption 5 with respect to other OLC legal analysis in addition to the opinion pertaining to DOD, and interagency deliberations regarding that analysis, as well as intra- and inter-agency deliberations regarding potential public statements by Executive Branch officials).

24

private party's allegation; if he declined, that ended the matter and thus gave the general counsel effective "authority to adjudicate such a claim against the claimant." *Id.* at 148.  The general counsel's final decision was documented in a memorandum summarizing the facts and providing an "answer to the legal or policy issue submitted together with a detailed legal rationale" for the final decision.  *Id.* at 140-42 (quotation marks omitted).  The *Sears* Court held that the memorandum explained the basis for the agency's decision not to file a complaint, and thus constituted a "final opinion . . . made in the adjudication of cases" that was subject to FOIA's affirmative publication requirement under 5 U.S.C. § 552(a)(2).  *Id.* at 148-54.[13]  The Court also held that predecisional documents that the agency chose to expressly adopt or incorporate by reference into the non-exempt final opinion were no longer exempt from disclosure under FOIA based on deliberative process privilege also subject to compelled disclosure.  *Id.* at 161.

In a companion case to *Sears*, the Supreme Court made clear that public disclosure of a predecisional document is not required under FOIA, "even when [the agency] agrees with [a privileged document's] conclusion" in a final opinion, unless the agency expressly adopts the reasoning of that predecisional document as the basis for the final opinion.  *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975); *see also id.* at 189.  The Court elaborated in *Grumman* that, "absent indication that [the] reasoning" of a predecisional document has been adopted by the agency as its own, "there is little public interest in disclosure of a report." *Id.* at 186.

In *National Council of La Raza v. DOJ*, the Second Circuit reiterated the rule of *Sears* that a document loses Exemption 5 protection when "the agency has chosen 'expressly to adopt or incorporate [it] by reference,'" for in that circumstance it "loses its predecisional and deliberative

---

[13]  Plaintiffs here do not contend that the DOD OLC Memorandum must be disclosed pursuant to section 552(a)(2).

character." 411 F.3d 350, 356 (2d Cir. 2005). The *La Raza* Court reaffirmed the need for a judicial determination that "*express* adoption or incorporation by reference has occurred," *id.* at 357 n.5 (emphasis added), and held that a casual or minor reference to a predecisional document cannot satisfy the requirement of express adoption, *id.* at 359 (citing *Tigue v. DOJ*, 312 F.3d 70, 81 (2d Cir. 2002), and *Access Reports v. DOJ*, 926 F.2d 1192, 1197 (D.C. Cir. 1991)). Furthermore, the *La Raza* Court instructed, "there must be evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice." *La Raza*, 411 F.3d at 359 (emphasis in original). And under *La Raza*, as under *Sears* and *Grumman*, both the conclusion and the reasoning of a document must be expressly adopted. *Id.* at 358–59; *accord Wood v. FBI*, 432 F.3d 78, 84 (2d Cir. 2005) (rejecting adoption argument where decisionmaker did not explicitly adopt the reasoning of an advice memorandum in deciding to decline criminal prosecution).

The facts of *La Raza* are important because of their stark contrast to the facts in this case. There, the Second Circuit premised its finding of express adoption on repeated public statements by the Attorney General and other senior DOJ officials, who explicitly invoked the reasoning of an OLC memorandum to explain and justify the Department's new policy of asking state and local law enforcement authorities to take certain actions to assist in the enforcement of federal immigration laws. *La Raza*, 411 F.3d at 357–58. In the Attorney General's first public announcement of the change in DOJ policy, he explicitly invoked OLC's advice that the actions DOJ was asking state and local law enforcement officials to take were lawful. *See id.* at 353 (explaining that OLC had "concluded that this narrow, limited mission we are asking state and local police to undertake voluntarily – arresting aliens who have violated criminal provisions of the Immigration and National[ity] Act, or civil provisions that render an alien deportable, those individuals who are listed on the

26

[National Crime Information Center database] – that narrow mission is within the inherent authority of the states."). The Attorney General and another high-level DOJ official subsequently sent letters to private groups and members of Congress explaining that "the policy of the Department" was the opinion by OLC that states "possess inherent authority to arrest individuals whose names have been entered into the [database] because they have both (1) violated civil provisions of the federal immigration laws that render them deportable and (2) [have] been determined by federal authorities to pose special risks." *Id.* at 353–54. As the letters continued, "The policy and the authority are no broader than this, and the narrow, limited mission that we are asking state and local police to undertake is a voluntary one." *Id.* at 354.

In addition, a senior counsel to the Attorney General gave a presentation to state and local law enforcement officers in June 2003, in which he "summarize[d]" the OLC memorandum and its reasoning. *Id.* The official concluded his presentation with the statement, "And so in the OLC opinion it came out very clearly, and the Attorney General did announce the summary of what that opinion is": "the OLC opinion doesn't say that immigration enforcement is an inherent authority of the states. It merely says, making an immigration arrest to assist the federal government lies within the inherent power of the states." *Id.* at 355.

The *La Raza* Court concluded, based on these repeated, explicit, and public references to the OLC memorandum, that DOJ regarded the reasoning in the OLC memorandum as the official policy of DOJ, to be presented to and relied upon by the public as such, and viewed the memorandum as setting out "the exclusive statement of, and justification for, its new policy on the authority of states to enforce the civil provisions of immigration law." *Id.* at 357. In addition, the DOJ officials' public and explicit discussion of the analysis in the OLC memorandum was made "to assure third parties

as to the legality of the actions the third parties were being urged to take." *Id.* Taken together, the Court held, the repeated, explicit and public references to the OLC memorandum were sufficient to incorporate the document as official agency policy and to render it subject to disclosure under FOIA. *Id.* at 358–59; *see also In re County of Erie*, 473 F.3d 413, 418 n.5 (2d Cir. 2007) (explaining that, in *La Raza*, the agency "had incorporated [the document] into its policy by repeatedly, publicly and expressly relying upon its reasoning and had adopted its reasoning as authoritative within the agency"); *accord Wood*, 432 F.3d at 84 (*La Raza* decided "[o]n the basis" of these three factors).

### 2.    Plaintiffs' Erroneous Theory of Adoption

Plaintiffs' proposed interpretation of the adoption doctrine should be rejected because it violates the core principles established by this binding precedent.

First and foremost, the adoption that plaintiffs ask the Court to find here is not express. Rather, plaintiffs ask the Court to hold that "adoption can be premised on only *implicit* reliance on a document's legal analysis." N.Y. Times Opp. at 17 (emphasis added); *see also id.* at 20 ("an express or explicit statement of incorporation is *not* required"). That is fundamentally wrong. In *Sears* itself, the Supreme Court emphasized (literally) the requirement that adoption be express: "if an agency chooses *expressly* to adopt or incorporate by reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final [adjudicatory] opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption" other than Exemption 5's deliberative-process privilege. 421 U.S. at 161 (emphasis in original).[14] "Express adoption" accomplished through "implicit reliance" is a contradiction in terms.

Plaintiffs argue that "*La Raza* specifically eschews a bright-line test . . . in which 'a document

---

[14]  Although italics do not appear in Westlaw and Lexis, they are present in the official version of the decision in the United States Reports.

may be deemed expressly adopted or incorporated only in the event that an agency, in essence, uses specific explicit language of adoption or incorporation.'" N.Y. Times Opp. at 17 (quoting 411 F.3d at 357 n.5). But while rejecting a bright-line test requiring that there be "specific, explicit language of adoption or incorporation," *La Raza* made clear that adoption must still be "express" and "explicit," *id.* at 357 & n.5, 359-60, as amply illustrated by the facts of that case – where the finding of express adoption was premised on multiple statements in dealings with the public by the Attorney General and other senior DOJ officials explicitly embracing the conclusion and reasoning of the OLC memorandum at issue.

Here, by contrast, as plaintiffs concede, no government official has expressly invoked or even mentioned the DOD OLC Memorandum in the course of publicly discussing or describing any government policy.[15] The only government statement proffered by plaintiffs as supposed evidence of adoption of the DOD OLC Memorandum – the Attorney General's March 5, 2012, national security address at Northwestern Law School, N.Y. Times Opp. at 18 (citing Normand Decl., Exh. D) – makes no mention of any OLC advice (or any other legal advice the Attorney General may have received), much less the specific OLC memorandum pertaining to DOD that has been withheld in this case. *See Wood*, 432 F.3d at 84 (finding no adoption where no high-level official had made public reference to privileged document).

---

[15] The only two occasions identified by plaintiffs in which any Executive Branch official even arguably referred publicly to an OLC memorandum on the subject of targeting involved responses by the Attorney General to questions posed by Members of Congress about the potential release of such a memorandum. *See* N.Y. Times Opp. at 10-11; Point II.A.3, *supra*. In neither instance did the Attorney General invoke any OLC opinion or other legal advice as a basis for agency policy, and in any event, even if the Court accepts plaintiffs' claims that the Attorney General was referencing such an opinion, such minor (or, as plaintiffs describe them, "casual[]," *id.* at 10) purported references to a privileged document cannot constitute adoption. *Tigue*, 312 F.3d at 81.

Because the Attorney General made no reference in his public remarks to any OLC advice, moreover, it is impossible to determine from the public record what, if any, role OLC's advice played in his thinking regarding the legal principles that apply to U.S. targeting decisions. A finding of adoption in these circumstances would therefore violate a second core principle of the adoption doctrine: that there be evidence that the policymaker adopted both the conclusion of a predecisional document *and its reasoning*. In the absence of *any* explicit public reference by the Attorney General to any OLC advice he may have received, there is no factual basis to conclude that the Attorney General adopted even the conclusion, much less the reasoning, of the DOD OLC Memorandum.

Plaintiffs ask the Court to infer adoption because, they claim, it is "logical" that the Attorney General must have been relying on OLC's advice when he publicly discussed the legal principles applicable to the United States' targeting decisions. But this argument contravenes a third important limitation on the adoption doctrine: "there must be evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice." *La Raza*, 411 F.3d at 359 (emphasis in original). No matter how logical plaintiffs' assumption that the Attorney General would not have "articulat[ed] legal concepts that differ substantially from DOJ's considered written legal analysis of the issue," N.Y. Times Opp. at 19, it is speculation, and thus cannot form the basis for a finding of express adoption under *La Raza*. There is simply no way to determine based on the Attorney General's public remarks whether he was relying on advice provided by OLC, or even if such advice was sought in connection with the matters that he addressed in those remarks. And under established precedent, that ends the inquiry.

Thus, contrary to plaintiffs' claim, N.Y. Times Opp. at 19, it would not be appropriate to review the DOD OLC Memorandum *in camera* for the purpose of determining whether it has been

expressly adopted as agency policy.  By definition, reviewing a privileged, predecisional document *in camera* cannot shed any light on whether any decisionmaker later expressly adopted or incorporated that advice as agency policy.  The relevant inquiry is whether the agency has expressly adopted the rationale of that document in a manner that supports compelled disclosure under FOIA, a question that the document itself cannot answer.  Even if the legal principles outlined in the Attorney General's public remarks used language that was very similar to analysis in the memorandum, that fact would not be indicative of any express adoption of the memorandum.

Plaintiffs are also wrong in asking the Court to consider "[t]he Attorney General's motivation in speaking about the legal basis for targeted killing," arguing that *La Raza* requires a finding of adoption "[w]here an explanation is made to 'assure third parties as to the legality of the actions the third parties were being urged to take.'"  N.Y. Times Opp. at 19 (quoting *La Raza*, 411 F.3d at 357).  Plaintiffs' attempt to analogize this case to *La Raza*, N.Y. Times Opp. at 18-19, only illustrates the error of their position.  Unlike in *La Raza*, this case does not involve repeated public statements by high-level agency officials urging third parties to take certain actions based on an assurance that a particular OLC opinion demonstrated "the legality of the actions" that the Department of Justice was asking those third parties to take.  411 F.3d at 357.  Here, there is nothing remotely equivalent to the four public letters by the Attorney General and other high-ranking officials in *La Raza*—which said, "[l]et me first state clearly the policy of the Department on this issue," followed immediately by a detailed recitation of the reasoning of the OLC memorandum at issue, expressly referring to that memorandum, and concluding with "[t]hus," followed by a description of the new policy.  *Id*. at 353-54.  Nor is there anything equivalent to a senior adviser to the Attorney General providing a public summary of that document and its reasoning, in an effort to encourage third parties to take a

31

particular action. *Id*. at 354.

Unlike in *La Raza*, the government here has not invited third parties, or the public, to rely on legal analysis set forth in a document that was publicly identified but not disclosed. Rather, the government has publicly identified the legal principles it would consider in making targeting decisions – through the Attorney General's remarks at Northwestern and the public statements of other Executive Branch officials – for the very purpose of allowing the public to consider whether "actions taken in their defense are consistent with their values and their laws." Normand Decl., Exh. D at 3, *quoted in* N.Y. Times Opp. at 19. If such statements by government officials were deemed sufficient to adopt the confidential legal advice that may have informed their decisions, it would discourage policymakers from publicly discussing the legal bases of their policies, a result fundamentally at odds with FOIA and Exemption 5.

Equally problematic is plaintiffs' contention that express adoption can be "demonstrated by an acknowledgment by the agency that it sought the OLC's advice and some evidence that the agency followed that advice." N.Y. Times Opp. at 17-18.[16] Even if there were such evidence, the notion that a policymaker adopts deliberative and confidential legal advice, and thereby forfeits the protection of Exemption 5, simply by acting in accordance with that advice is flatly contrary to *La Raza* and *Sears*, and could cause substantial harm to the ability of government agencies to seek and follow legal advice in the course of setting agency policy. As the Second Circuit observed in *County of Erie*, "[a]ccess to legal advice by officials responsible for formulating, implementing and

---

[16] Contrary to the suggestion in plaintiffs' brief, there is no evidence in the record that DOD sought OLC's advice, much less that the advice has been relied upon in connection with any actual operations. The record indicates only that the responsive opinion pertaining to DOD "contains confidential legal advice to the Attorney General, for his use in interagency deliberations, regarding a potential military operation in a foreign country." Bies Decl. ¶ 30.

monitoring government policy is fundamental to promoting broader public interests in the observance of law and administration of justice." 473 F.3d at 419 (citation, alteration and quotation marks omitted); *see also Tigue*, 312 F.3d at 76 (deliberative process privilege secures important public interests by protecting candid exchanges of views, thorough evaluations of opposing arguments, and confidentiality for proposed policies that have not yet been adopted, in order to enhance agency decisionmaking).

This observation is particularly apt in the context of OLC, whose role is to provide candid and forthright legal analysis to agencies throughout the federal government, a sensitive task for which confidentiality is inherently necessary. Bies Decl. ¶¶ 2-7. Compelled disclosure of confidential OLC advice based simply on the fact that a client agency later followed OLC's advice would not only cause harm to the government in this case, it would inhibit OLC's very ability to carry out its mission as the government's confidential legal adviser, because the risk of compelled disclosure would both deter agency clients from seeking OLC's advice and inhibit full and frank discussions between OLC and its clients, and possibly inhibit the candor with which OLC presents its views as well. And more broadly, a finding of adoption based only on evidence that advice of counsel had been sought and followed would deter agency officials from disclosing to the public that they had consulted with counsel, or publicly discussing the legal principles or analysis that apply to a given policy, for fear of being deemed to have adopted the legal advice they received. This would result in less public disclosure of the operations of government, contrary to FOIA's central purpose.

### 3. Plaintiffs Erroneously Rely on District Court Decisions That Are Inconsistent with Supreme Court and Second Circuit Precedent

Rather than applying the well-established principles discussed above, plaintiffs rely heavily on a handful of district court decisions that are inconsistent with Supreme Court and Second Circuit

33

precedent.  Most notably, plaintiffs rely on the district court's decision in *Brennan Center for Justice v. U.S. Department of Justice*, No. 09 Civ. 8756(VM), 2011 WL 4001146 (S.D.N.Y. Aug. 21, 2011), *see* N.Y. Times Opp. at 18, but they fail to advise the Court that the government's appeal of that decision is currently pending before the Second Circuit.[17]  In *Brennan Center*, the district court ordered disclosure of an informal OLC advice memorandum and two draft OLC opinions concerning the constitutionality of a funding-eligibility condition in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act, 22 U.S.C. § 7631(f), concluding that those OLC advice documents were no longer privileged because they had been adopted as official agency policy.  2011 WL 4001146, at *1-*2.  In its appeal, the government contends that the district court erred by, among other things, finding express adoption of the confidential and privileged OLC advice documents based on inference and speculation, rather than any express statement indicating that the agencies in question adopted both OLC's conclusion and its reasoning, and on evidence that an agency acted consistently with the legal advice it received.  This Court should decline plaintiffs' invitation to commit the same errors in this case.  In any event, the *Brennan Center* court relied on certain public statements referencing OLC's advice concerning the constitutionality of the statute.  *See* 2011 WL 4001146, at *4-*7.  There are no such public statements by agency officials in this case invoking the DOD OLC Memorandum.

The other two other district court decisions cited by plaintiffs, *Bronx Defenders v. DHS*, No. 04 Civ. 8576(HB), 2005 WL 3462725 (S.D.N.Y. Dec. 19, 2005), and *National Day Laborer Organizing Network v. ICE* ("*NDLON*"), 827 F. Supp. 2d 242 (S.D.N.Y. 2011), were not reviewed by the Second Circuit, and both misconstrued the adoption doctrine.  The district court in *Bronx*

---

[17]  The Court of Appeals heard argument in the *Brennan Center* appeal on February 21, 2012.

*Defenders*, in concluding that a privileged document had been adopted, relied heavily on the fact that the document was referenced in a later OLC memorandum made public only as a result of a separate FOIA action. 2005 WL 3462725, at *4. As explained above, express adoption cannot be premised on such circumstantial evidence that an agency implicitly relied on, or acted in accordance with, confidential legal advice. The *Bronx Defenders* court also mistakenly relied on statements by OLC rather than the agency itself to conclude that the agency had adopted OLC's reasoning, with no explanation of why that was logical or reasonable. *Id.* at *4–*5. Importantly for purposes of this case, moreover, the district court in *Bronx Defenders* relied upon, *inter alia*, OLC memoranda that "reflect[ed] the FBI's policy as it has changed over . . . [the] years," along with the FBI's statement that it had sought legal support from OLC and a topic paper that purported to "follow" the OLC memorandum at issue. 2005 WL 3462725, at *7. Plaintiffs can identify no similar public references to OLC advice in this case.

The district court's decision in *NDLON* was also wrong. The court there held that the agency had adopted as agency policy a memorandum presenting agency attorneys' advice on whether state and local law enforcement officials could opt out of participation in a federal initiative under which the fingerprints of individuals arrested by those officials are shared with the Department of Homeland Security to determine if immigration enforcement action is required. 827 F. Supp. 2d at 257-60. Critically, the *NDLON* court identified no statement that could be considered "express adoption" of the memorandum. Instead, the court relied on statements by agency officials praising the document, *id.* at 258 & n.98, and agency communications that reached the same conclusion that the memorandum had reached (that there was a legal basis for making participation in the federal initiative mandatory), or referenced some of the legal authorities discussed in the memorandum, *id.*

at 259 & n.105 (citing *id.* at 254-55 nn.74–75).  The district court also relied on the fact that agency

officials had previously asked the legal office producing the memorandum to gather support for

making participation in the initiative mandatory and had asked for an early version of the

memorandum to be rewritten, *id.* at 259, and that, four days after the memorandum was issued, the

department head publicly announced that the program was mandatory and asserted the "legal

legitimacy" of that conclusion, *id*.  Finally, the *NDLON* court erroneously suggested that, because

the memorandum "was the *only* document comprehensively laying out the legal authority for making

[the agency initiative] mandatory," its analysis must have been relied upon and adopted by the

agency as the legal basis for its policy.  *Id.*  This reasoning is inconsistent with the requirement of

express adoption of a document's reasoning and conclusion, and was based instead on the kind of

speculation about possible agency motivation that the Second Circuit held in *La Raza* "will not

suffice" as a basis for incorporation.  411 F.3d at 359.

     *Brennan Center*, *NDLON* and *Bronx Defenders* thus reflect a fundamental misunderstanding

of *La Raza* and *Sears*, and fail to adhere to the explicit limitations in those decisions, and should not

be followed here.

          4.      **The DOD OLC Memorandum Does Not Constitute Agency "Working Law" or "Secret Law"**

     Plaintiffs' argument that the DOD OLC Memorandum must be disclosed because it

constitutes agency "working law" or "secret law," N.Y. Times Opp. at 15-16, is also erroneous.  This

argument confuses "secret law," which the courts have required to be disclosed under FOIA, with

confidential legal advice, which is routinely and properly shielded from disclosure by Exemption 5

and the deliberative-process and attorney-client privileges.

     "Secret law" or "working law" means "those policies or rules, and the interpretations thereof,

that either create or determine the extent of the substantive rights and liabilities of a person," *i.e.*, those policies and rules that a private party may have cause to rely upon. *Afshar*, 702 F.2d at 1141; *see also, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980) ("working law" or "secret law" consists of agency guidance or precedent applied by agency staff in their dealings with the public); *Leeds v. Comm'r of Patents & Trademarks*, 955 F.2d 757, 762 (D.C. Cir. 1992) (documents "used to develop 'uniform policies' . . . and relied upon as separate documents by agency personnel to make decisions . . . in similar cases").

In contrast, legal advice memoranda written by agency attorneys with no policymaking authority for consideration by a decisionmaker "fit[] exactly within the deliberative process rationale for Exemption 5," and do not qualify as "final opinions" subject to disclosure as "secret law." *Brinton v. Dep't of State*, 636 F.2d 600, 604-05 (D.C. Cir. 1980) (holding that legal advice memoranda prepared by attorneys in Office of the Legal Advisor for the Secretary of State did not constitute the agency's "secret law"). As the D.C. Circuit explained in *Brinton*, "[t]his flow of advisory material is exactly opposite to the paradigm of 'final opinions,' which typically flow from a superior with policy-making authority to a subordinate who carries out the policy." *Id*. at 605. Accordingly, unless a decisionmaker "expressly adopts or incorporates [a legal advice memorandum] as working law," such memoranda remain exempt from disclosure. *Id*.; *see also La Raza*, 411 F.3d at 360 (reasons supplying the basis for an agency policy that are actually adopted by the agency constitute the agency's "working law").

Like the legal advice memoranda at issue in *Brinton*, the DOD OLC Memorandum bears none of the indicia of "secret law." It does not govern the conduct of any private parties, is not invoked in "dealings with the public," *Coastal States*, 617 F.2d at 869, does not create or determine

"the substantive rights and liabilities of a person," *Afshar*, 702 F.2d at 1141, flows from a subordinate to a superior, *Brinton*, 636 F.2d at 605; *Coastal States*, 617 F.2d at 868, and is not relied upon in connection with adjudicatory decisions, *Sears*, 421 U.S. at 155-58. *See also Citizens for Responsibility & Ethics in Washington v. Office of Adm'n*, 249 F.R.D. 1, 7 (D.D.C. 2008) (rejecting "secret law" argument and refusing to compel disclosure of OLC legal memorandum that was not used to discharge regulatory duties or in dealings with the public). Nor, for the reasons discussed above, has the DOD OLC Memorandum been expressly adopted as official policy within the meaning of *La Raza*.

Further, plaintiffs' "secret law" argument also ignores the grave ramifications of compelling disclosure of confidential legal advice memoranda provided to decisionmakers. *See* Bies Decl. ¶¶ 2-7; *supra* at 32-33. Predecisional legal advice "must remain uninhibited and thus undisclosed, in order to supply maximum assistance to the [decisionmaker] in reaching its decision." *Grumman*, 421 U.S. at 186. Indeed, a central purpose for Exemption 5 is the need to protect the government's ability to obtain such confidential legal advice. *See In re Lindsey*, 148 F.3d 1100, 1105 (D.C. Cir. 1998). That protection would be illusory if such legal advice were held to be "secret law," the disclosure of which is compelled by FOIA, simply because a decisionmaker acted in a manner consistent with that legal advice or discussed publicly the legal principles applicable to government policies or decisions.

### B.     Plaintiffs Have Not Shown Any Waiver of Exemption 5's Protection Through Public Disclosure of the DOD OLC Memorandum

For similar reasons, plaintiffs also fail to establish that the deliberative process or attorney-client privileges have been waived through prior public disclosure of the DOD OLC Memorandum.

### 1.    Plaintiffs Fail to Establish That Any Executive Branch Official Has Publicly Disclosed the DOD OLC Memorandum

An agency may waive a claim of privilege (and thus the protection of Exemption 5) by publicly disclosing the specific information sought to be withheld. *See Mobil Oil Corp. v. EPA*, 879 F.2d 698, 701 (9th Cir. 1989) (addressing waiver in context of Exemption 5). While an agency bears the burden of establishing that a claimed exemption applies, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130; *accord Mobil Oil*, 879 F.2d at 701; *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 60 (D.C. Cir. 2003). It is insufficient to show that an agency has released information similar to that it seeks to withhold; courts "generally have found that the release of certain documents waives FOIA exemptions *only for those documents released*." *Mobil Oil*, 879 F.2d at 701 (citations omitted; emphasis in original). "If a requester is unable to establish that the material he seeks is in the public domain," the agency can withhold the material so long as it satisfies each element of the claimed exemption. *Davis v. DOJ*, 968 F.2d 1276, 1280 (D.C. Cir. 1992).

Plaintiffs do not even attempt to meet this strict standard. They offer no evidence that the DOD OLC Memorandum, or any portion of it, has in fact been disclosed publicly by any agency official.[18] Like their adoption argument, plaintiffs' waiver claim is based entirely on the assumption that the Attorney General and State Department Legal Adviser Harold Koh must have relied on OLC's legal analysis, because it supposedly "defies belief that the cornerstone legal principles being

---

[18]  Plaintiffs do not contend, nor could they, that the protections of Exemption 5 were lost by virtue of unsourced media reports about alleged "OLC memoranda about the program." N.Y. Times Opp. at 11 n.3. Waiver requires that "an authorized disclosure [be] voluntarily made to a non-federal party." *Florida House of Representatives v. United States Dep't of Commerce*, 961 F.2d 941, 946 (11th Cir. 1992).

39

articulated by these officials were not also at the heart of the OLC DOD Memorandum." N.Y. Times Opp. at 24. But a finding of waiver, like a finding of adoption, cannot be premised on inferences and speculation; plaintiffs must demonstrate that the DOD OLC Memorandum has been "*specifically* revealed to the public" and that the information revealed to the public "appears to *duplicate*" the memorandum that has been withheld. *Mobil Oil*, 879 F.2d at 701 (emphasis in original). They have not come close to doing so here.

Plaintiffs ignore these authorities and instead argue, based on two district court decisions, that "an explicit mention of the underlying document is not necessary to find waiver of the attorney-client privilege." N.Y. Times Opp. at 23 (citing *NDLON*, 827 F. Supp. 2d 242, and *Nat'l Immigration Project of Nat'l Lawyers Guild v. DHS*, No. 11 Civ. 3235 (JSR), 2012 WL 375515 (S.D.N.Y. Feb. 7, 2012)). Those district court decisions are not persuasive and, in any event, do not support a finding of waiver here.

*NDLON*, as explained above, erroneously found adoption in the absence of any express statement of reliance upon the privileged legal memorandum at issue. *See supra* at 35-36. That same error also infected the *NDLON* court's waiver analysis: although agency officials discussed in broad strokes some of the legal issues and authorities that were addressed in detail in the memorandum, *see* 827 F. Supp. 2d at 254-55, disclosure of the general subject matter of a privileged document is insufficient as a matter of law to establish waiver, *see Mobil Oil*, 879 F.2d at 701. In any event, and critically for purposes of this case, the *NDLON* court found that the plaintiffs had "produced extensive specific evidence of waiver" by demonstrating that "much of the precise information" in the memorandum had been released by the agency in other documents produced in the FOIA litigation. *See* 827 F. Supp. 2d at 255-56 ("Nearly every component of the October 2

Memorandum appears in some public document or statement by the defendants[, including] nearly all of the factual background, specific references to and discussions of all of the statutes upon which the Memorandum relies, and even significant components of the legal discussion regarding the strengths and weaknesses of the agency's position.").  Plaintiffs here, by contrast, have produced not a shred of "specific evidence" that any agency official has publicly disclosed any of the "precise information" in the OLC DOD Memorandum.

The other case on which plaintiffs rely, *National Immigration Project of National Lawyers Guild v. DHS*, 11 Civ. 3235 (JSR), 2012 WL 375515 (S.D.N.Y. Feb. 7, 2012), is also easily distinguishable.  There, the district court held that the government had waived the attorney-client privilege over the factual portions of an email chain because the Office of the Solicitor General supposedly made "unilateral testimonial use" of the email by "disclos[ing] the existence of a purported policy" to the Supreme Court, "the details of which d[id] not appear to reside anywhere outside the email chain." *Id*. at *7.  Even putting aside the obvious flaws in the district court's conclusion that a statement in a brief could constitute a "testimonial use," it is plain that the circumstances here are entirely different.

> **2.     Plaintiffs Fail to Establish Any Other Conduct That Would Vitiate the Attorney-Client Privilege**

Nor have plaintiffs shown any other government conduct that could strip the DOD OLC Memorandum of the protection of the attorney-client privilege.  Plaintiffs' reliance on *La Raza* is (again) misplaced.  The *La Raza* Court held that "the government could not invoke the attorney-client privilege to bar disclosure of a legal memorandum where the government had incorporated it into its policy by repeatedly, publicly and expressly relying upon its reasoning and had adopted its reasoning as authoritative within the agency." *County of Erie*, 473 F.3d at 418 n.5 (citing *La Raza*,

41

411 F.3d at 360-61).  Although the Second Circuit did not decide whether that conduct would suffice

to waive the attorney-client privilege under normal waiver standards, 411 F.3d at 361 n.9, the Court

emphasized the government's use of the privilege as both a sword and a shield, which is also a

relevant factor in finding waiver, at least in the context of litigation.  *Compare id.* at 361 ("We

cannot allow the Department to make public use of the Memorandum when it serves the

Department's ends but claim the attorney-client privilege when it does not.") *with In re Grand Jury

Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("fairness considerations arise when [a] party

attempts to use the privilege both as 'a shield and a sword'").

Here, by contrast, no Executive Branch official has attempted to use the DOD OLC

Memorandum as a sword.  Unlike in *La Raza*, the Attorney General here did not explicitly and

publicly invoke any privileged OLC advice as support for the legal principles outlined in his remarks

at Northwestern Law School, nor did State Department Legal Adviser Harold Koh or any other

Executive Branch officials.  *See* N.Y. Times Opp. at 23-24.  There is therefore no basis to override

the attorney-client privilege under the rationale of *La Raza*.[19]

Citing *County of Erie*, 473 F.3d at 418 n.5, plaintiffs erroneously contend that the attorney-

---

[19]  The Court in *La Raza* applied *Sears*'s holding regarding adoption and incorporation by
reference to include documents otherwise covered by the attorney-client privilege, although it did
not separately perform a traditional waiver analysis of such documents.  411 F.3d at 360.  The
government understands this extension of *Sears*'s holding to be limited to the facts in *La Raza*,
discussed above, which may have been sufficient to have waived the government's
attorney-client privilege with respect to the document at issue there.  To the extent that *La Raza*
might be read to suggest that there is no need to consider waiver of attorney-client privilege
separately where there has been an express adoption, however, the government believes that such
an extension of the adoption doctrine would misconstrue *Sears* and thus would be in error.  *Cf.
Sears*, 421 U.S. at 154 n.21 (stating that a document that is both a "final opinion" and "an
intra-agency memorandum within Exemption 5," would be "nondisclosable"); *Fed. Open Mkt.
Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 n.23 (1979).  The government
therefore reserves the right to challenge this aspect of *La Raza* if necessary.

client privilege "operates differently," and is entitled to less protection, when the underlying legal advice influences government policy. N.Y. Times Opp. at 21; *see id.* (asserting that "legal policy advice stands on a different footing"); *see also id.* at 24 (arguing that "the privilege's purposes are not served where the legality of a policy has been put into public issue"). In fact, the Second Circuit's decision in *County of Erie* stands for the opposite proposition:

> We believe that, if anything, the traditional rationale for the attorney-client privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice. Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest.

473 F.3d at 419 (citation, alteration and quotation marks omitted).

The government's withholding of the DOD OLC Memorandum falls squarely within this rationale. OLC provided confidential legal advice to Executive Branch officials on matters of the utmost importance: the legal basis for the potential use of targeted lethal force against persons, including United States citizens, who are operational leaders of al-Qaida or associated forces. It is in precisely such circumstances that scrupulous protection of the privilege is most important. *See* Bies Decl. ¶ 4. The Executive Branch officials who are charged with making such decisions are "duty-bound to understand and respect constitutional, judicial and statutory limitations on their authority," and "their access to candid legal advice directly and significantly serves the public interest." *County of Erie*, 473 F.3d at 419.

> **C.      The ACLU Fails to Establish Any Express Adoption of the DOD Legal Memoranda or Waiver Through Public Disclosure**

In three sentences at the end of its brief, the ACLU contends that "the arguments made by

the *New York Times* with respect to Exemption 5 . . . also apply to the legal memoranda disclosed by the DOD in its *Vaughn* index." ACLU Opp. at 48. The ACLU's cursory treatment does not come close to establishing that the internal DOD legal memoranda have been expressly adopted as agency policy or disclosed publicly in a manner that would waive privilege.

With regard to adoption, the ACLU contends that the deliberative process and attorney-client privileges do not apply to the DOD legal memoranda because "the analysis they contain has been adopted by the defendant agencies." *Id.* As a threshold matter, DOD has not asserted the attorney-client privilege over the memoranda, so only the deliberative process privilege is at issue. Neller Decl. ¶ 16; Gov't Br at 40-41. And the ACLU fails to explain how these DOD memoranda could have been adopted by "the defendant agencies," including DOJ and CIA. Nor has the ACLU identified any evidence of express adoption of the legal memoranda or public disclosure of their contents, other than to refer obliquely (and without any citation) to "the various disclosures made by the government officials, including the Attorney General and the General Counsels of the CIA and DOD." ACLU Opp. at 48-49. None of those statements, in fact, made any reference whatsoever to the legal memoranda withheld by DOD, or any legal advice. *See* Normand Decl., Exhs. D-G. The ACLU's adoption argument should be summarily rejected.

## IV.    The Agencies Conducted Reasonable Searches

The Court should also reject the ACLU's arguments that the agencies' searches were unreasonable simply because the ACLU can imagine that agencies could have used more exhaustive search terms and provided more detailed declarations. The agencies' declarations establish that their searches were reasonably calculated to discover the requested documents. The law requires nothing more. *See Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (when "a

plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." (internal quotation marks omitted)).

### A.    OLC Conducted a Reasonable Search

The Bies Declaration is more than adequate to describe the reasonable search that OLC conducted.  Gov't Br. at 12.  The ACLU admits that the search appears to be reasonable and complete, but nonetheless raises two quibbles with the search terms.  First, the ACLU argues that it is unclear whether a search for "Awlaki" would generate results for "al-Awlaki."  ACLU Opp. at 33-34.  Because OLC indicated that it uses sophisticated search software, and because OLC paralegals are experienced in running keyword searches, one reasonably could expect such variations to be included in search results.  Bies Decl. ¶¶ 18-24, 27.  Second, the ACLU complains that OLC appears not to have used the alternate transliteration, "Aulaki."[20]  ACLU Opp. at 36-37.  But plaintiffs provide no reason to believe that this is a common or necessary transliteration, or that there are missing documents as a result (particularly given the other search terms also used).

In any event, an agency's search "need not be perfect, but rather need only be reasonable." *Grand Cent. Partnership, Inc.*, 166 F.3d at 489; *see also Garcia v. DOJ*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002) ("The agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive

---

[20] As the ACLU noted in its request, there are two common transliterations for Aulaqi:  Awlaki and Aulaqi, *see* Bies Decl., Exh. E at 2, n.2, both of which OLC used here, *see id.*, Exh. H.  In the government's opening memorandum, counsel inadvertently combined the two forms.  The spelling "Aulaki" is not one typically used.  *See, e.g.,* Herrington Decl. ¶ 17; Supp. Hibbard Decl. ¶ 5.

documents." (internal citations omitted)).  The described search was clearly a reasonable effort to locate responsive records.  *See also Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 12 (D.D.C. 2009) ("A search is not inadequate merely because its terms are limited."); *Vest v. Dep't of Air Force*, 793 F. Supp. 2d 103, 119 (D.D.C. 2011) (finding that search for all spelling variants was not required).

## B.     OIP Conducted a Reasonable Search

The Hibbard Declaration also describes a reasonable search in substantial detail.  Gov't Br. at 12-13.  The ACLU's nitpicks here include purported "overly restrictive search terms," a lack of information about sampling in some offices, and a lack of specific information with regard to the Office of the Associate Attorney General, ACLU Opp at 34, 36-38, none of which suggests that the search was not reasonably calculated to uncover the responsive records.

As with OLC, the ACLU's contention that it would have used different search terms is not probative of whether OIP's search was reasonable.  OIP used fewer search terms than OLC in part because it covers offices with a broader range of interests.  OIP has submitted a supplemental declaration explaining that broader terms were attempted and rejected because they generated a large volume of non-responsive documents.  *See* Supplemental Declaration of Douglas Hibbard, dated August 8, 2012 ("Supp. Hibbard Decl."), ¶¶ 5-6.  Moreover, OIP's limitation on the search of names to documents also including the word "target" is reasonable in light of the language of the ACLU's request, which did not seek all documents concerning Aulaqi, but rather information on the factual and legal basis for the alleged individual targeting decisions.  *Id.; see* ACLU Request at 3-6.  In any event, the Department and the relevant records custodians are in the best position to devise reasonable search terms based on their knowledge of what is likely to be in the relevant files.  *See*

Supp. Hibbard Decl. ¶¶ 1, 3.

With respect to sampling in the Offices of the Attorney General and the Deputy Attorney General, it is most relevant that OIP reviewed each and every document located in searches of the principal records custodians on this issue in each office. *See* Hibbard Decl. ¶¶ 12, 19; Supp. Hibbard Decl. ¶ 7. With respect to the non-principal custodians, a search was nonetheless conducted to make sure that no documents were missed. Because no documents were found in a substantial sample, further review was rejected as unreasonable. *See* Supp. Hibbard Decl. ¶ 7. To provide further information about how many non-responsive results were returned could reveal internal information about the focuses of these offices, which has not been requested by plaintiffs here and which is not necessary to evaluate the general reasonableness of the search.

The ACLU points out that OIP did not uncover some of the documents located by OLC. "Of course, the failure to turn up [a] document does not alone render the search inadequate; there is no requirement that an agency produce all responsive documents." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995). Again, the focus is on whether the search was reasonable. *See Grand Central P'ship, Inc.*, 166 F.3d at 489 (adequacy of search turns on "whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant"). Here, the search as described was plainly reasonable on its own terms.

With respect to the Office of the Associate Attorney General, OIP did not describe the specific search terms used, but the search was initiated as it was in the other offices – by sending a memorandum asking the Office to identify relevant records and/or records custodians. Hibbard Decl. ¶ 9. Each staff member was then notified of the need to conduct a search of paper and electronic

47

files.  *Id*.  Only one person was determined to possess potentially responsive material, and further review revealed that no records were responsive.  Hibbard Decl. ¶¶ 27-28.  The ACLU can hardly complain that OIP did not focus its search efforts or its declaration on an office where no relevant records custodians were identified.  Moreover, no information suggests that the Associate Attorney General's Office was engaged on this issue.  *See Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999) ("[A]n agency need not conduct a search that plainly is unduly burdensome."); *see also Friends of Blackwater v. U.S. Dept. of Interior*, 391 F. Supp. 2d 115, 120 (D.D.C. 2005) (noting that while agency failed to enumerate any specific search terms used in examining electronic files, that fact alone "might not be enough to invalidate an otherwise adequate affidavit").

### C.      DOD Conducted a Reasonable Search

DOD conducted a reasonable search as well.  *See* Neller Decl. ¶¶ 9-10.  The ACLU complains primarily about the Neller Declaration's alleged lack of detail as to the record systems searched, the search terms employed, and the use of code names.  Any arguable deficiency in the Neller Declaration is more than remedied, however, by the supplemental declaration submitted herewith, which includes additional details about offices and systems searched and the search terms used. *See* Declaration of Mark Herrington, dated August 8, 2012 ("Herrington Decl."), ¶¶ 9-17.  As with the other agencies, DoD staff relies on their knowledge of the relevant files and the advice of the relevant records custodians in order to ensure that the searches are reasonably calculated to turn up the requested records.  *Id*. ¶ 11.

The ACLU's complaint about the lack of code names fails for the same reasons as its other complaints regarding search terms.  Moreover, to identify operational code names – or even that an agency did or did not employ operational code names – clearly implicates the concerns raised in the

Neller Declaration.  *See* Neller Decl. ¶ 26; Herrington Decl. ¶ 8.  DOD has not acknowledged any particular operation against a U.S. citizen, and is not required to do so in order to demonstrate an adequate search.

### D.        The CIA's Declaration Is More Than Sufficient

Where an agency has provided a No Number, No List response to a FOIA request, it  has by definition determined that the volume of responsive documents, as well as descriptive details, are classified facts that could reveal the depth and breadth of an agency's interest in a subject matter. *See, e.g., Bassiouni v. CIA*, 392 F.3d 244 (7th Cir. 2004); *Jarvik v. CIA*, 741 F. Supp. 2d 106 (D.D.C. 2010).  The threshold legal issue in such cases is whether the agency is required to disclose the volume and details of responsive documents.  Accordingly, as with a Glomar response, a search would be futile and should not be required at all.  *See, e.g., Wolf,* 473 F.3d at 375 (rejecting plaintiff's argument that a search was required because the "argument misunderstands the nature of a Glomar response, which narrows the FOIA issue to the existence of records *vel non*"); *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 934 (D.C. Cir. 2012) ("Because we find the Janosek Declaration sufficient to support NSA's Glomar response, requiring NSA to conduct a search and segregability analysis would be a meaningless—not to mention costly—exercise."); *see also  Lewis v. U.S. Dep't of Justice*, 609 F. Supp. 2d 80, 84 (D.D.C. 2009) (upholding categorical refusal to search for documents that would necessarily be exempt as infringing on the privacy of third parties, reasoning that "whether defendant actually searched for [the] records  . . . is immaterial . . . because that refusal deprived [plaintiff] of nothing to which he is entitled").

In defendants' motion for summary judgment, the CIA provided a No Number, No List response to the entirety of the ACLU Request.  Bennett Decl. ¶ 17.  Although the CIA indicated that

it did, in fact, conduct a reasonable search, *id*., and described that search in its *ex parte* and *in camera* submission, that information was not necessary to sustain the CIA's FOIA response, and there is no need for the CIA to provide further search information.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the government's declarations and opening memorandum of law, the Court should grant summary judgment to defendants and dismiss the complaints.

Dated:  August 8, 2012

Respectfully submitted,

STUART F. DELERY                           PREET BHARARA
Acting Assistant Attorney General          United States Attorney for the
                                           Southern District of New York

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General


By:    */s/ Elizabeth J. Shapiro*          By:    */s/ Sarah S. Normand*
       ELIZABETH J. SHAPIRO                        SARAH S. NORMAND
       AMY POWELL                                  Assistant United States Attorney
       20 Massachusetts Ave., NW                   86 Chambers Street, Third Floor
       Washington, D.C. 20530.                     New York, New York 10007
       Telephone: (202) 514-5302                   Telephone:  (212) 637-2709
       Facsimile: (202) 616-8470                   Facsimile:  (212) 637-2702
       Elizabeth.Shapiro@usdoj.gov                 Sarah.Normand@usdoj.gov

50